EXHIBIT "A"

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF GEORGIA
COLUMBUS DIVISION

| | |
|---|---|
| GREG DYKSMA and TAMMY DYKSMA, as Parents and Natural Guardians of Nicholas Dyksma, Deceased, and as Personal Representatives of the ESTATE OF NICHOLAS DYKSMA, <br><br> Plaintiffs, <br><br> vs. <br><br> DEPUTY TOMMY PIERSON, SGT. JOE HARMON, DEPUTY HEATH DAWSON, DEPUTY WILLIAM STURDEVANT, and SHERIFF MIKE JOLLEY, <br><br> Defendants. | Civil Action File No. <br> 4:17-CV-00041-CDL |

## DECLARATION OF THOMAS ("TOMMY") PIERSON

STATE OF GEORGIA

COUNTY OF HARRIS

COMES NOW THOMAS ("TOMMY") PIERSON, who declares and affirms that the following statements are true and correct:

1.

My name is THOMAS PIERSON, and I am known as "Tommy Pierson", as

identified in this lawsuit. I am more than eighteen (18) years of age and legally competent to give this Declaration. Except where apparent, the statements contained in this Declaration are based upon my personal knowledge and are made in connection with the above-referenced lawsuit.

2.

On August 31, 2015, I was employed and on duty as a patrol deputy with the Harris County Sheriff's Office.

3.

At approximately 0200 hours (2:00 a.m.), Harris County 911, made a radio transmission regarding a suspect vehicle being pursued by officers with the Columbus Police Department northbound on Highway 27, coming toward Harris County.

4.

I informed 911 that I would be in route to Highway 27 to respond and assist, and I later received information describing the suspect vehicle being pursued as a small gray Toyota pickup truck.

5.

After getting on Highway 27, I spotted the suspect offender in the gray Toyota pickup truck, and, after catching up to it, I activated the blue lights and

2

siren on my patrol car.

6.

The offender, who was later identified as Nicholas Dyksma, did not obey my signal to stop and instead increased his speed.

7.

Dyksma swerved into and frequently drove in the wrong lane or straddled the center line as he recklessly fled.

8.

I was the primary pursuit officer directly behind Dyksma, and Sgt. Joe Harmon (Harris County Sheriff's Department) got behind my patrol car and was the secondary officer in the pursuit.

9.

Through radio communications, another Harris County deputy, William Sturdevant, informed us that he would deploy stop sticks at a certain location to try to stop the vehicle.

10.

After the stop sticks were successfully deployed by Deputy Sturdevant, causing Dyksma's speed to decrease substantially as he drove north in the

southbound lane, I got my patrol car ahead of him in the northbound lane and Sgt. Harmon stayed behind Dyksma, and we tried to box him in.

11.

As I started to veer my patrol car over to block the pickup truck, Dyksma accelerated and his truck struck the side of my patrol car; at that point, I steered more to the left and forced the pickup truck onto the shoulder of the road where it stopped.

12.

Sgt. Harmon drove his patrol car around my vehicle and stopped; I backed up my patrol car so I could get out, and then I drew my Glock pistol and got out.

13.

Sgt. Harmon had gotten out and had his Glock pistol drawn, and he went to the driver's door; he repeatedly commanded Dyksma to show his hands, but Dyksma ignored his commands.

14.

Deputy Heath Dawson also arrived at the scene; the truck doors were locked and Dyksma was not obeying commands and had not turned off the truck. Dawson then busted out the driver's side window with his ASP baton.

15.

After the window was busted, Dyksma tried to drive again, pressing the gas pedal and spinning the tires, causing the truck to slide forward.

16.

Sgt. Harmon drew his Taser and then deployed his Taser at Dyksma through the window, and Dyksma fell over onto the passenger's side of the seat.

17.

I was on the passenger's side of the truck, and since the door was also locked, Deputy Dawson came to the passenger's side and broke out the window.

18.

Deputy Dawson then removed Dyksma from the vehicle, and, with my assistance, placed Dyksma on the shoulder of the road. Dyksma made strange growling or grunting noises while he was in the truck and while he was being removed, and it appeared he was high on something.

19.

Given Dyksma's criminal conduct during the pursuit and the attempted stop, his striking my patrol car, and his obstructive actions and failure to obey commands, I believed Dyksma would likely be combative upon being removed from the vehicle; therefore, I believed it was important to make sure he was

physically restrained during the handcuffing process and search.

20.

Therefore, once we got Dyksma on the ground, I immediately squatted and placed my right knee on top of his upper back, near the lower neck area, to use a portion of my body weight to hold Dyksma down to keep him from raising his upper body.

21.

I held my right knee on his upper back area for about 20 seconds while Deputy Dawson placed handcuffs on Dyksma, and during that time I adjusted and released some pressure a couple of times; during this process, Dyksma was clearly breathing and making growling or grunting sounds. Dyksma showed no signs of physical distress related to the physical pressure I briefly applied.

22.

After the initial handcuffing, I stood up and moved to the other side of Dyksma and, to make sure he was subdued, again put my right knee on the top of Dyksma's upper back while Deputy Sturdevant continued searching Dyksma's clothing; after about 15 seconds, I lifted my knee and stood up.

23.

I never pressed my knee against either side of Dyksma's neck during the

brief periods of time when I held my knee on top of Dyksma's upper back/lower neck area.

24.

During the times that I had my knee on the top of Dyksma's upper back, I could feel physical resistance from Dyksma; I also heard Dyksma breathing and making the same type growling sounds he had made while inside the truck following the application of the Taser and while being pulled out.

25.

During the brief time I applied some knee pressure on him, Nicholas Dyksma never gave any indication that the pressure was causing him any physical problem, and it was obvious the pressure did not interfere with his ability to breathe, as I heard and saw him breathing and heard him making sounds.

26.

In my training and experience as a deputy in regard to using physical force or body weight to restrain a suspect, I had never been instructed or directed not to put body weight on the top of a person's upper back, at or near the lower neck area to keep the person from raising up or moving about.

27.

Before and at the time of this incident, I had never received any instruction or training that putting some body weight on the top of a person's upper back or top of the lower neck for a period of seconds would cause harm to the person's health.

28.

As of the time of this incident, I had never heard of the term "compressional asphyxia".

29.

As of the time of this incident, I had never heard of the vagus nerve, and had never heard of any potential effect on the vagus nerve by putting some body weight pressure on the top of a person's upper back or lower neck.

### DECLARATION UNDER 28 U.S.C. § 1746

I declare under penalty of perjury that the foregoing is true and correct.

Executed on the __6__ day of April, 2018 in the State of Georgia, United States of America.

_____
THOMAS PIERSON