**In the Matter Of:**

GREG DYKSMA, et al.  vs. DEPUTY TOMMY PIERSON, et al.

---

## DEPOSITION OF

## DEPUTY TOMMY PIERSON

*October 19, 2017*

---



1201West Peachtree Street
Suite 2300
Atlanta, GA 30309
404.847.0999

Case 4:17-cv-00041-CDL   Document 40   Filed 05/15/18   Page 2 of 81

GREG DYKSMA, et al.  vs. DEPUTY TOMMY PIERSON, et al.                    DEPOSITION OF
DEPUTY TOMMY PIERSON on 10/19/2017

```
 1          IN UNITED STATES DISTRICT COURT FOR THE
                   MIDDLE DISTRICT OF GEORGIA
 2                    COLUMBUS DIVISION

 3

 4

 5    GREG DYKSMA and TAMMY       )
      DYKSMA, as Parents and      )
 6    Natural Guardians of        )
      Nicholas Dyksma, Deceased,  )
 7    and as Personal             )
      Representatives of the      )
 8    ESTATE OF NICHOLAS DYKSMA,  )    CIVIL ACTION NO:
                                  )    4:17-cv-00041-CDL
 9         Plaintiffs,            )
                                  )
10    vs.                         )
                                  )
11    DEPUTY TOMMY PIERSON,       )
      SERGEANT JOE HARMON,        )
12    DEPUTY HEATH DAWSON,        )
      DEPUTY WILLIAM STURDEVANT,  )
13    and SHERIFF MIKE JOLLEY,    )
                                  )
14         Defendants.            )

15

16

17          Oral deposition of Deputy Tommy Pierson,

18    witness, called by the Plaintiffs, before Inna

19    Russell, Certified Court Reporter, held in Harris

20    County Courthouse, Grand Jury Room, located at 102

21    N. College Street, Hamilton, Georgia 31811 on the

22    19th day of October, 2017, commencing at 10:30 a.m.

23

24

25
```



1201 West Peachtree Street
Suite 2300
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

Case 4:17-cv-00041-CDL   Document 40   Filed 05/15/18   Page 3 of 81

GREG DYKSMA, et al.  vs. DEPUTY TOMMY PIERSON, et al.                 DEPOSITION OF
DEPUTY TOMMY PIERSON on 10/19/2017                                            Page 2

1                    APPEARANCE OF COUNSEL

2

3    On Behalf of the Plaintiffs:

4                    Craig T. Jones, Esq.
                      The Orlando Firm
5        315 West Ponce de Leon Avenue, Suite 400
                    Decatur, Georgia 30030
6                        404.315.1800
                    craig@orlandofirm.com

7

8    On Behalf of the Defendants:

9                    Terry E. Williams, Esq.
              Williams, Morris & Waymire, LLC
10        4330 South Lee Street, Bldg. 400, Suite A
                    Buford, Georgia 30518
                       (678)541-0790

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25



1201 West Peachtree Street
Suite 2300
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

1          INDEX OF EXAMINATIONS

2

3                                                    PAGE

4

5   BY MR. JONES                                      06

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25



1201 West Peachtree Street
Suite 2300
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

1            INDEX TO EXHIBITS

2

3     PLAINTIFF       DESCRIPTION                        PAGE

4     Exhibit 1       Incident report                    51

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25



1201 West Peachtree Street
Suite 2300
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

```
 1              S T I P U L A T I O N S

 2

 3       IT IS STIPULATED AND AGREED by and between

 4  counsel appearing for the respective parties that:

 5       (1)  The oral deposition of Deputy Tommy

 6  Pierson, called by the Plaintiffs, taken before

 7  Inna Russell, in Harris County Courthouse, Grand

 8  Jury Room, located at 102 N. College Street,

 9  Hamilton, Georgia, commencing at 10:30 a.m., on

10  the 19th day of October, 2017;

11       (2)  ALL FORMALITIES with reference to notice

12  of taking, notice of time and place of taking,

13  qualifications of the court reporter, and all

14  other matters precedent to the taking of

15  deposition, are WAIVED;

16       (3)  With consent of deponent, the reading and

17  signing of the deposition by deponent is NOT

18  WAIVED;

19       (4)  ALL OBJECTIONS, EXCEPT as to the form of

20  the question and responsiveness of the answer, are

21  RESERVED to the time of the hearing of the case;

22  and

23       (5)  ALL FORMALITIES with reference to the

24  filing of deposition, including notice of filing,

25  et cetera, are WAIVED.
```



1201West Peachtree Street
Suite 2300
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

```
 1              Deposition of Deputy Tommy Pierson

 2                    October 19, 2017

 3         MR. JONES:  This will be the deposition of

 4     Thomas C. Pierson, taken by the Plaintiff for

 5     purposes of discovery, cross-examination and all

 6     other purposes allowed by law.  And the deposition

 7     is taken by agreement of counsel and pursuant to

 8     notice.  And all objections will be reserved,

 9     except for those going to the form of the question

10     or the responsiveness of the answer; is that

11     agreeable?

12         MR. WILLIAMS:  That's agreeable.  We'll

13     reserve signature.

14         MR. JONES:  Okay.  Go ahead and swear him in,

15     please.

16              THOMAS C. PIERSON,

17         Having been duly sworn, testified under oath

18     as follows:

19              E X A M I N A T I O N

20         BY MR. JONES:

21     Q.   Mr. Pierson, can you tell us your full name

22     for the record?

23     A.   Thomas Carl Pierson.

24     Q.   Okay.  And we are at the Harris County

25     Courthouse today taking your deposition?
```



1201 West Peachtree Street
Suite 2300
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

1      A.    Yes, sir.

2      Q.    Okay.  Are you -- you are presently an inmate;

3    right?

4      A.    Yes, sir.

5      Q.    What is your status as far as law enforcement

6    goes?  Do you still have the certification or has

7    that been suspended?

8      A.    Not active.

9      Q.    Not active?

10      A.    No, sir.

11      Q.    Is it under suspension until you can have an

12    appeal or something or is it done-done?

13      A.    I'm not sure, but I'm done with it.

14      Q.    You are done with it, you are not going back?

15      A.    No, sir.

16      Q.    Okay.  How long have you been in law

17    enforcement?

18      A.    I guess, it was around about five years or so.

19      Q.    Okay.  And how much of that five years was

20    with Harris County Sheriff's Department?

21      A.    Approximately, a year and a half.

22      Q.    Approximately, a year and a half.  Where did

23    you work before that?

24      A.    Muscogee County Sheriff's Office.

25      Q.    Oh, in Muscogee?  Why did you leave Muscogee?



DISCOVERY
LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

1    A.    To come to Harris County.  It was home.

2    Q.    It's close to the home?

3    A.    I live up in Harris County.

4    Q.    Okay.  And did you have any -- were there any

5    problems, you know, any reasons why you left Muscogee

6    as far as, you know, any discipline or personality

7    conflicts with anybody or anything like that, that

8    made you want to leave?

9    A.    No, sir, not at all.

10   Q.    Okay.  So you are -- I guess, if you grew up

11   here, you know Sheriff Jolley; right?

12   A.    Yes, sir.

13   Q.    Is that how you got the job?  You went to

14   him?

15   A.    No, sir.  He doesn't actually do the hire and

16   fire, from what I understand.

17   Q.    Okay.  So you just put in the application, you

18   didn't, like, call -- you didn't call up anybody that

19   was already here to try to put --

20   A.    I've known some people that work up here.  But

21   I mean, if you're asking about special favors or

22   anything, I don't know of any.

23   Q.    Okay.  You don't have a -- for example, you

24   don't have a family member that was in the

25   department?



1      A.    No, sir.  No family member, just friends.

2      Q.    And what is your current family situation as

3    far as being married and having kids and all?

4      A.    Married, kids, blended family.

5      Q.    Okay.  It's none of my business, but how are

6    they taking this situation that you are in right now?

7      A.    Well, we are -- we are all fighting through it

8    together.

9      Q.    Okay.

10      A.    And it's --

11      Q.    Are you getting -- are they getting

12    counseling?

13      A.    We're looking into some things, to do some

14    things.

15      Q.    Are you getting counseling or that's still up

16    in the air, I guess?

17      A.    I've talked to a couple of people but nobody

18    on a regular basis.

19      Q.    Okay.

20      A.    Except for clergy.

21      Q.    Okay.  We are -- you know, we are here about

22    -- you know we are not here about that.  You are here

23    about that later, but I mean, we are here right now

24    just about this incident involving my client Nicholas

25    Dyksma, you know, who died in this traffic stop?



1201 West Peachtree Street
Suite 2300
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

 1     A.     Yes, sir.

 2     Q.     You have a good memory of that incident?

 3     A.     Good being relative.

 4     Q.     Okay.  Well, let me put it this way.  Do you

 5   remember when that occurred, approximately?

 6     A.     The date?

 7     Q.     Yeah.  Or you know, the month and the year.

 8     A.     Late summer.  Was it August or September or

 9   something, 2015.

10     Q.     Okay.  And how long after that did you stop

11   working as a deputy sheriff?

12     A.     February of '16.

13     Q.     Okay.  So basically, it just happened within

14   the last six months of your employment; right?

15     A.     About six or seven months.

16     Q.     Right.  And I assume, at some point you know,

17   you found out you have been sued, you got some papers

18   and you reviewed some documents, maybe looked at some

19   videos?

20     A.     I didn't actually receive any papers.

21   Mr. Williams called me and we touched base.  And he

22   told me how and what was going on.  But I never

23   received any papers.

24     Q.     Okay.  Yeah, I think I sent them to the

25   department and you weren't here anymore, so they took



```
 1   them for you.
 2      A.    Okay.
 3      Q.    So in preparation for the deposition today,
 4   did you look at the video or any of the videos of the
 5   incident?
 6      A.    Yes, sir, I looked at some.
 7      Q.    Okay.  When did you -- when was the last time
 8   you saw that video?
 9      A.    We went over it earlier.
10      Q.    Earlier today?
11      A.    Yes, sir.
12      Q.    Okay.
13      A.    Briefly, very briefly.
14      Q.    Okay.  But did you look at the -- do you
15   remember whose car the video you looked at?  I don't
16   guess it matters, but.
17      A.    I don't.  I don't know whose it was.
18      Q.    But this was the one that -- it's a video --
19   did you look at more than one video or just one?
20      A.    Just one.
21      Q.    Okay.  You saw -- you saw the video that
22   showed Mr. Dyksma being extracted from the car and
23   being, you know, being placed in custody?
24      A.    Yes, sir.
25      Q.    Right.  And the -- what do you remember about
```



DISCOVERY
LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

1201West Peachtree Street
Suite 2300
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

1   that -- I guess, what do you remember about being

2   dispatched on that incident?  In other words, what's

3   -- this stuff is not on the video, you know, the

4   stuff that would have transpired before the video;

5   what do you remember about that?

6       A.   To the best of my memory, a call came from 911

7   dispatch.  They said there was a police chase coming

8   out of Columbus towards Harris County, and they were

9   asking us to respond for assistance.

10      Q.   Okay.  And do you know whether the -- what do

11  you recall as far as what the underlying cause of the

12  police chase was?  Do you know why they were pursuing

13  him?

14      A.   We didn't know at the time.

15      Q.   You didn't know, you just knew there was a

16  pursuit?

17      A.   Yes, sir.

18      Q.   Okay.  And I guess, the idea was that y'all

19  would pick it up at the county line?

20      A.   If need be.

21      Q.   If need be.  And where did you -- I guess,

22  where were you approximately when you got that call;

23  do you remember?

24      A.   I believe, I was over at Warm Springs Road,

25  315 area.



1201West Peachtree Street
Suite 2300
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

1    Q.   So about how far is that from the scene when
2  y'all stopped Dyksma's truck?
3    A.   Several miles.  I don't know.
4    Q.   Yeah.  So tell me when you got the call, where
5  did you go as far joining in to the --
6    A.   The route of travel I took?
7    Q.   Yeah.  Where would you have gone?  Yeah,
8  exactly, what route would you have taken?
9    A.   I would have taken Highway 315.  I headed
10 west, and then I got on Holland Road and cut over to
11 Highway 27 and went south on 27.
12   Q.   South toward Columbus?
13   A.   Yes, sir.
14   Q.   So and then, did you -- did you get out -- did
15 you stop and position yourself somewhere and wait for
16 him or --
17   A.   No, sir, he was --
18   Q.   He was already there when you got there?
19   A.   He was still traveling north when I passed,
20 then I turned around.
21   Q.   Okay.  So you then became the lead vehicle in
22 the pursuit?
23   A.   Yes, sir.
24   Q.   Was there any other car behind him when you
25 joined in?



```
 1      A.    No, sir.

 2      Q.    The Muscogee people had already called off the

 3   pursuit?

 4      A.    Yes, sir.  They said they had broke it off at

 5   the county line.

 6      Q.    How far away was that from where you picked it

 7   up?

 8      A.    I don't know the exact distance, but I would

 9   say it was probably -- I don't think it was more than

10   a mile.  It was pretty close.

11      Q.    So and they basically -- your understanding is

12   that they stopped at the county line, knowing that

13   you guys were going to pick it up?

14      A.    I believe they came into the county a little

15   bit.  Are you familiar with Harris County at all?

16      Q.    Not so much.  A little bit.

17      A.    Okay.  My understanding, they broke it off

18   right around Coca Lake.

19      Q.    Okay.  I guess, what I'm asking, did they

20   follow -- did they basically just kind of fall back

21   and follow until they were confident that you had it

22   under control?

23      A.    I can't speak for them.

24      Q.    Did you see them?  Did you see their blue

25   lights?
```



GREG DYKSMA, et al.  vs. DEPUTY TOMMY PIERSON, et al.                    DEPOSITION OF
DEPUTY TOMMY PIERSON on 10/19/2017                                              Page 15

1    A.    I did not, no.

2    Q.    So you -- at some point -- are you saying at

3  some point then, they turned around before you

4  actually picked up the pursuit?  You never saw them?

5    A.    I never saw them.  I saw the vehicle that they

6  were pursuing.

7    Q.    Yeah.  Did you -- did you see any other --

8  were there any other Harris County vehicles in the

9  area before you were or were you the first one there?

10    A.    I was the first one there.

11    Q.    Okay.  So when you first saw the vehicle, how

12  fast was it going?

13    A.    I don't recall.

14    Q.    It was -- was he -- at that point, was he

15  still running or did it look like he had slowed down

16  and was trying to, you know, trying to vanish in the

17  scenery?

18    A.    I believe, he had slowed at that point.

19    Q.    He had slowed down?

20    A.    Yes, sir.

21    Q.    And then, when he saw you -- well, when you

22  got behind him, he started to pick it up again?

23    A.    Yes, sir.

24    Q.    Okay.  At the point where you picked it up,

25  did you have an idea on the subject?  Did you have a



1201 West Peachtree Street
Suite 2300
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

```
 1   tag number or anything?
 2        A.    When I got behind him, I got his tag number.
 3   Prior to that, we had a vehicle description.
 4        Q.    So nobody from Muscogee or Columbus had
 5   radioed ahead the tag information or anything?
 6        A.    I don't remember if they did or not.
 7        Q.    If they did, it didn't come to you?
 8        A.    I don't remember.
 9        Q.    I guess -- well, you are not on the same radio
10   frequency as they are, are you?
11        A.    No, sir, we are not.
12        Q.    So whatever call you got, it came from your
13   dispatcher?
14        A.    Right.
15        Q.    And so you wouldn't know what was communicated
16   by them to your dispatcher?
17        A.    No, sir.  They have those records.
18        Q.    Okay.  So is it fair to say that all you knew
19   was that there was a pursuit and it was coming in on
20   27, and you were headed that way?
21        A.    Yes, sir.
22        Q.    And so can you tell us what happened once --
23   let's see, we were talking about speed.  When you
24   first saw him, were you approaching from the opposite
25   direction?
```



```
 1      A.    Yes, sir.

 2      Q.    Okay.  So he went by you?

 3      A.    Yes, sir.

 4      Q.    And I guess, is that when you turned your blue

 5   light on or was it already on because you were

 6   responding to the scene?

 7      A.    I did not have blue lights on at that time.

 8      Q.    You did not?

 9      A.    No, sir.

10      Q.    So there wouldn't be any video of you going to

11   the scene?

12      A.    I don't know if the video would have been on

13   or not, but.

14      Q.    Okay.  But when you turned around to start

15   pursuing him, you turned it on then; right, blue

16   light and siren?

17      A.    Not until I had gotten up to where I know the

18   deputy was.

19      Q.    How come you didn't do that?  I mean, how come

20   you didn't turn on your blue light?  Were you trying

21   to just basically follow him as opposed to stopping

22   him?

23      A.    Well, I got behind him.  We were trying to

24   make sure we identified the vehicle, had it right.

25   To the best of my memory, this may or may not be
```



GREG DYKSMA, et al.  vs. DEPUTY TOMMY PIERSON, et al.
DEPUTY TOMMY PIERSON on 10/19/2017

DEPOSITION OF
Page 18

1    completely accurate, but my sergeant, who was the

2    next one we came across, had told me to wait until I

3    got up to him.  He was at the intersection of Holland

4    and 27.  And when I got to him, that's when I turned

5    on the lights.

6         Q.    Okay.  So it's fair to say, you didn't make

7    any attempt to stop the vehicle until then; right?

8         A.    Not until I was advised to.

9         Q.    Okay.  And when you were advised to, had they

10   already put stop strips down at that point?

11        A.    No, sir.  Not at that point.

12        Q.    So at that point, you were -- you were going

13   to go and try to stop him because there were also

14   backup officers there?

15        A.    Yes, sir.

16        Q.    And so was he -- until you turned his blue

17   lights on -- until you turned all your blue lights,

18   was he basically staying within the speed limit or

19   close to it?

20        A.    I believe.  I don't recall specifically.

21        Q.    But then, when you turned on your blue light

22   to stop him, he didn't stop, did he?

23        A.    No, sir, he didn't.

24        Q.    And what did -- did he accelerate?  Did it --

25   was it an O.J. pursuit or was he trying to get out of



GREG DYKSMA, et al.  vs. DEPUTY TOMMY PIERSON, et al.                    DEPOSITION OF
DEPUTY TOMMY PIERSON on 10/19/2017                                              Page 19

1    there?

2       A.   No.  He was trying to evade me.  It wasn't a

3    slow O.J. pursuit.

4       Q.   Right.  This was, what, at one o'clock in the

5    morning?

6       A.   I believe, it was -- I want to say around

7    2:00, actually.

8       Q.   Okay.  So basically, it's an open road?

9       A.   Very, very little traffic.  I don't recall

10   seeing another vehicle on the road at that time.

11      Q.   And if there had been, you would have seen

12   their headlights well in advance?

13      A.   Yes.

14      Q.   So you get -- when you started trying to --

15   how far would you say you pursued him before he got

16   to the stop strips?

17      A.   Several miles.  I don't know exactly.

18      Q.   So you told me about where you picked him up

19   at; right?  Holland Road, I think?

20      A.   That's where we turned the lights on and tried

21   to get him to stop.

22      Q.   Okay.  And do you remember the -- can you

23   remember any frame of reference as far as where the

24   stop actually happened, like a mile marker or a cross

25   road or anything?



DISCOVERY
LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

1201West Peachtree Street
Suite 2300
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

GREG DYKSMA, et al.  vs. DEPUTY TOMMY PIERSON, et al.          DEPOSITION OF
DEPUTY TOMMY PIERSON on 10/19/2017                                    Page 20

1    A.    I don't know the mile marker, but it was just

2  north of 27 and 208 intersection.

3    Q.    Okay.  I just came in there -- they are paving

4  it right now.

5    A.    Are they?

6    Q.    Yeah.  So from here to Talbotton, it's like

7  stop and go.  Well, Waverly Hall to Talbotton.

8    A.    Yeah.

9    Q.    So.  How -- how far is it basically from

10 Holland Road to 208?  I mean, it is what it is.  I

11 just want to see if you can give us an

12 approximation.

13   A.    I don't know.  Four or five miles, maybe.

14   Q.    Okay.

15   A.    I'm not sure.

16   Q.    All right.  And so what would you say was the

17 top speed that you got to during the pursuit?

18   A.    To the best of my knowledge, it was -- we went

19 over 80, I believe.

20   Q.    Okay.  And it's probably -- what is that, 55

21 there or 60?

22   A.    It's -- 55 is the highest that gets on that

23 road.  We went through some lower zones as well.

24   Q.    Okay.  All right.  So basically, he was going

25 about as fast as I would have if the road wasn't



1201West Peachtree Street
Suite 2300
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

1   being paved.

2          So tell me what happened and, you know,

3   whether -- I know you saw the video recently.  So

4   basically, if you could just kind of tell me what you

5   remember from that point forward, whether you

6   actually remember it in your head or whether you saw

7   it on the video.  You know, just kind of give me your

8   impression of what happened from that point.

9     A.   Well, during the pursuit, like I said, the

10  speeds got up, I'm sure, over 80.  He was driving a

11  good bit on the wrong side of the road.

12    Q.   Um-hum.  As were you?  I mean, you go around

13  curbs, you cross the center line now and then;

14  right?

15    A.   Yeah, right.

16    Q.   But I understand, you have -- you have

17  authority to operate an emergency vehicle under

18  emergency vehicle conditions, and he doesn't.  You

19  know, he's got to comply with the speed limit.

20    A.   Right.

21    Q.   So that's the only thing you got him -- right

22  now you got him for speeding and crossing the center

23  line; right?

24    A.   And eluding.

25    Q.   Eluding.  Right.  Okay.  And so plus whatever



1201 West Peachtree Street
Suite 2300
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

GREG DYKSMA, et al.  vs. DEPUTY TOMMY PIERSON, et al.
DEPUTY TOMMY PIERSON on 10/19/2017

DEPOSITION OF
Page 22

1    they wanted him for in Muscogee, which you still

2    don't know what that is?

3        A.    Right.

4        Q.    Okay.  So tell me what -- go ahead and

5    continue what you were saying.

6        A.    Okay.  Being the lead car, I was focused on

7    him, staying behind him and driving.  Sergeant Harmon

8    behind me was radioing, communicating with other

9    officers and dispatch.  They set the stop strips up

10   in front of the VFW.  That was Deputy Sturdevant.

11          There was a good hit on the tires.  We didn't

12   know where he was going.  So once the tires were

13   blown, I don't remember if all of them got hit or

14   not, but I know there was a good hit, and the vehicle

15   slowed down.  But he was still trying to drive.

16          As we approached 208, when his vehicle was

17   slowing down, I pulled up alongside of him and

18   Sergeant Harmon stayed behind him.

19          It looked as though, from what I remember, it

20   looked as though he was going to turn towards 208.

21   So I kind of cut him off there.  And then, I got

22   between him and 208.  And he was slowing down like he

23   was going to stop.  I pulled over in front of him.

24   And when I got in front of him, he accelerated again

25   and hit my vehicle.



DISCOVERY
LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

1201 West Peachtree Street
Suite 2300
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

```
1      Q.   His tires were flat at that point, whether he
2   realized this or not; right?
3      A.   I don't know how many were flat.  I know we
4   got at least a couple of them, but I don't know how
5   many.
6      Q.   But you think, you think -- do you think he
7   stopped voluntarily or do you think he just stopped
8   because of the strips and his car was disabled?
9      A.   I thought he was stopped involuntarily.
10      Q.   Okay.  And then he tried to kick it when you
11   --
12      A.   The vehicle could still move without tires.
13   It can't go near as fast.  You don't have the control
14   of it, but it could still move.
15      Q.   Now, it's off the road at this point; right?
16      A.   No, sir.
17      Q.   No, it's not?
18      A.   At this point, we are still on the road.
19      Q.   Okay.
20      A.   Yes.
21      Q.   So tell me what happens next.  He tries to
22   give you a head fake and --
23      A.   And he rammed into my vehicle.  Then we went
24   from there over into the ditch.  After he hit my
25   vehicle, I steered over into the --
```



DISCOVERY
LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

1201 West Peachtree Street
Suite 2300
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

1     Q.    Um-hum.

2     A.    -- got him off the road.  I believe, Sergeant

3   Harmon was the first one out of a vehicle.  I

4   couldn't get out immediately.  My door was pinned

5   with the truck.

6     Q.    Right.  Y'all were kind of T-bone together?

7     A.    Side-by-side.

8     Q.    Side-by-side.

9     A.    Yeah.  But I couldn't open my door, so I think

10   Sergeant Harmon got out first.  I backed up a little

11   bit where I could open my door and get out.

12    Q.    Okay.

13    A.    Sergeant Harmon was yelling verbal commands at

14   him.  He was not following those commands.

15    Q.    "Get the fuck out of the vehicle", that kind

16   of thing?

17    A.    I believe, he said something like that.

18    Q.    Yeah.  And the guy -- was the guy in the

19   vehicle, Dyksma, you said he wasn't responding to

20   command.  Could you see him doing anything in

21   response to command, like was he trying to start the

22   car up or, you know?

23    A.    The car was still running.  The vehicle was --

24    Q.    Was he trying to get away or was he just

25   sitting there and not doing anything?



GREG DYKSMA, et al.  vs. DEPUTY TOMMY PIERSON, et al.
DEPUTY TOMMY PIERSON on 10/19/2017

DEPOSITION OF
Page 25

1    A.   The vehicle was still running.  And at one

2  point after we had gotten out, he tried to drive off

3  again.  And the fact that he was in the ditch, his

4  tires wouldn't catch, but he did move several feet.

5  I don't know how far, but his vehicle moved a good

6  bit when he tried to drive off.

7         Deputy Dawson busted the window out for

8  Sergeant Harmon.  Sergeant Harmon ended up tasing him

9  at some point.  And I don't know exactly when that

10  was.

11    Q.   Is it your understanding he was still inside

12  the truck when he was tased or was it after they

13  pulled him out?

14    A.   I don't know for sure.

15    Q.   Okay.

16    A.   I believe, he was inside.

17    Q.   Right.  And so did you -- do you know if he

18  got a good hit on the Taser?

19    A.   I don't know.  As far as I know, he did, but

20  I'm not sure.

21    Q.   I mean, when they pulled him out of the --

22  when they pulled him out or when y'all pulled him out

23  of the truck, he was temporarily immobilized, wasn't

24  he, by the Taser?

25    A.   He was -- not at that point.  I think, he was



DISCOVERY
LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

1201 West Peachtree Street
Suite 2300
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

1   -- I think, when we pulled him out, he was already

2   resisting us.

3       Q.   So the Taser probably basically just slowed

4   him down enough to where y'all could get him?

5       A.   The Taser only is a five second

6   incapacitation.  As soon as that five seconds is

7   over, you've got full ability to do whatever.

8       Q.   Well, you know, and they start -- if it's

9   still connected, I mean, you could always, they could

10  always give him another jolt?

11      A.   Yes, he could have done that.

12      Q.   Do you know if he did that?

13      A.   No, I don't know.

14      Q.   Do you know if he did it once, twice, three

15  times or whatever?

16      A.   I don't know.

17          MR. JONES:  Okay.  We don't have the logs on

18     that, do we?  I don't think I --

19          MR. WILLIAMS:  In the GBI.  You got the GBI

20     file; right?

21          MR. JONES:  What did they say, one or two?

22          MR. WILLIAMS:  One.

23          MR. JONES:  Five seconds?

24          MR. WILLIAMS:  One of five seconds.

25          BY MR. JONES:



1    Q.   And so tell me what -- tell me everything you

2  can remember after he was -- after you saw -- well,

3  hold on a second.  You know somebody tased him, you

4  didn't see him tase him?

5    A.   I believe, I saw it.

6    Q.   Okay.  You just weren't sure whose hand it

7  was?

8    A.   I think, it was -- I'm sure it was Sergeant

9  Harmon that did it.

10    Q.   Harmon, okay.  Do you know that because of the

11  --

12    A.   I know when we were looking at the video.

13    Q.   Got you.

14    A.   I know he was the one that was on that side of

15  the vehicle while Deputy Dawson and I were on the

16  passenger side, trying to get that door open.

17    Q.   Right.  And actually once -- so when Harmon

18  tased Dyksma, he at that point, he had already broken

19  the window and was able to get inside of the vehicle;

20  right?

21    A.   The door was locked.  I don't know when he

22  ended up opening it, if he opened that door.

23    Q.   Oh, that's right.

24    A.   The window was broken, but I don't know if the

25  door ever came up on the driver side.



1201West Peachtree Street
Suite 2300
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

1    Q.   The idea was once he was going to be able to

2   reach in to do it, but then the guy started going the

3   other way?

4    A.   I don't know.

5    Q.   Okay.  So anyway, he tases him and you guys,

6   you and Dawson are on the other side?

7    A.   Yes, sir.

8    Q.   Okay.  And tell me what you and Dawson did as

9   far as removing Dyksma from the car.

10    A.   Deputy Dawson was the first to -- I opened the

11   door, and while I was -- after I opened the door,

12   Deputy Dawson was already pulling him out.

13        I assisted Deputy Dawson as did Deputy

14   Sturdevant as well.  He arrived on scene as we were

15   gaining control of him, getting him on the ground and

16   handcuffed.  So we got him handcuffed.  We searched

17   him for weapons.  I believe, Deputy Sturdevant found

18   a weapon in his waistband and --

19    Q.   Was it a knife in his pocket; is that what you

20   are talking about?

21    A.   I thought it was in his waistband.

22    Q.   Pocket knife; right?

23    A.   No.  I didn't find --

24    Q.   How do you put a knife -- how do you put a

25   pocket knife in your waistband?



1201 West Peachtree Street
Suite 2300
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

1     A.   I didn't find it.  I don't know.

2     Q.   Okay.  But anyway, you took a knife from --

3  but your understanding was he wasn't wielding the

4  knife, he had it on his --

5     A.   He had it on him.  Yes.  It wasn't in his

6  hands.

7     Q.   Right.  And y'all would have -- y'all, what,

8  naturally patted him down --

9     A.   Right.

10     Q.   -- to see what he had.

11     A.   Right.  We patted him down, searched for

12  weapons.

13     Q.   And in that process took out his wallet and

14  anything else too; right?  To get a --

15     A.   If he had anything on him.

16     Q.   Right.

17     A.   He was wiggling around, trying to get up, move

18  around.  We were trying to hold him still.  I didn't

19  do the pat down, so I don't know what was found or

20  pulled off of him.

21     Q.   How would you describe his demeanor when you

22  got him out?  I mean, did he look like he was

23  impaired?

24     A.   I would say he was -- he was under the

25  influence of something, but I didn't know what.



GREG DYKSMA, et al.  vs. DEPUTY TOMMY PIERSON, et al.
DEPUTY TOMMY PIERSON on 10/19/2017

DEPOSITION OF
Page 30

```
 1    Q.   Okay.  Did you -- this is maybe a difficult
 2  question, but when you -- the whole time you were
 3  pursuing him, was he in control of the vehicle or was
 4  he ever like weaving out of the control or anything
 5  like that?
 6    A.   I don't remember exactly.  I haven't seen the
 7  video from that.
 8    Q.   But when you say that he was -- I mean, he
 9  basically, I mean, he took you on a chase for four or
10  five miles; right?
11    A.   Yes, it was not safe driving.
12    Q.   Right.  I understand that.
13    A.   He wasn't taking precautions as he was
14  driving.
15    Q.   Right.  I understand that.  I guess what I'm
16  saying is that he was in control of the vehicle, he
17  just was not -- he was breaking the law?
18    A.   Definitely breaking the law.
19    Q.   Right.
20    A.   Yes.
21    Q.   And I guess what I'm trying to say, was he
22  like, you know, was he like, you know, falling down,
23  unable to drive a car, you know, drunk or on drugs or
24  was he just, you know -- how did he appear to be?
25  You said he looked like he was under the influence of
```



1   something.

2      A.   Just by his -- his eyes were kind of glazed

3   over.  And we didn't see him walking.  We didn't see

4   him, you know, his fine motor skills.  We didn't see

5   any of that.

6      Q.   Right.  Y'all took him out and put him on the

7   ground, so you can handcuff him; right?

8      A.   Right.

9      Q.   And I guess what I'm getting at is he was --

10  whatever it was, he was impaired to where, you know,

11  he was able to be in control of a car and to resist

12  you.  But you could still tell, once you got to him,

13  you could still tell that there was something not

14  right?

15     A.   There seemed to be something not right.  But

16  again, I didn't know what it could have been.

17     Q.   Did you hear him say anything?

18     A.   He didn't -- I did not hear him say any

19  words.

20     Q.   Yeah.  Did you hear him making any noises,

21  like maybe rambling incoherently, you know, just

22  speaking nonsense?

23     A.   No, sir.  Nothing he -- no noises seemed to be

24  trying to communicate.  The noises were kind of a

25  screaming.



1201 West Peachtree Street
Suite 2300
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

GREG DYKSMA, et al.  vs. DEPUTY TOMMY PIERSON, et al.                    DEPOSITION OF
DEPUTY TOMMY PIERSON on 10/19/2017                                              Page 32

1    Q.   Okay.

2    A.   Or not trying to say words.

3    Q.   Right.  Now, as far as the screaming, are you

4    talking about just the reaction to the Taser or are

5    you talking about, like, getting in your face, you

6    know, yelling, you know, kind of thing?

7    A.   Well, again, he wasn't trying to say words

8    when we were -- when we were trying to gain control

9    of him and get handcuffs on him, I know he was just,

10   I guess, more like almost frustration, but it sounded

11   like "rrrrrrr", but.

12   Q.   Okay.

13   A.   But he did not appear to be trying to

14   communicate any words to us.

15   Q.   Right.  I guess, you said frustration, you

16   know, you couldn't -- can you tell -- well, could you

17   tell if he -- it looked like he was in pain?  Was he

18   grimacing or whatever?

19   A.   He didn't appear to be in pain.

20   Q.   Okay.  So whatever he was on, maybe

21   anesthetized him?

22   A.   Perhaps.  I can't speak to that.

23   Q.   Yeah.  I guess, I mean, if you were to tase me

24   right now, I'd probably scream, you know.  I'd get

25   over real quick, but I would probably scream.  So I'm



1201 West Peachtree Street
Suite 2300
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

1    wondering, did he just kind of scream and stop or did

2    he just keep on screaming?

3        A.    People have different reactions to Tasers.

4    Some people will scream, some people won't make a

5    sound.

6        Q.    Yeah.

7        A.    I've seen people that weren't affected by

8    Tasers.  They just grabbed the prongs and popped them

9    out and kept going.

10            But the Taser was over when we were

11   handcuffing him.  He was -- he was kind of lurching

12   at us and -- not lurching at us, but he was on the

13   ground.

14       Q.    When he was on the ground, was he still on --

15   was he on his back at this point or stomach?

16       A.    He was on his stomach.

17       Q.    On his stomach.

18       A.    He was faced down.  And we were trying to get

19   the handcuffs on him.  And even after we had the

20   handcuffs on him, he was still trying to kick his

21   legs and push back against us and everything, so.

22       Q.    But at that point, when he is on the ground

23   and he is handcuffed and he is, you know, he is kind

24   of kicking his legs still, there is -- basically, at

25   that point, there is four officers and one him;



DISCOVERY
LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

1201 West Peachtree Street
Suite 2300
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

GREG DYKSMA, et al.  vs. DEPUTY TOMMY PIERSON, et al.          DEPOSITION OF
DEPUTY TOMMY PIERSON on 10/19/2017                                    Page 34

1  right?

2      A.    There was four officers on the scene, yes.

3      Q.    Okay.  At least three of them were --

4      A.    Three of us holding --

5      Q.    -- holding him down?

6      A.    We are holding him and get him handcuffed and

7  search him for weapons.

8      Q.    Okay.  So the screaming, would you say was he

9  screaming like somebody that had just been tased or

10  was he screaming like a madman?

11      A.    I don't know.  Screaming may be the wrong

12  word.

13      Q.    Yelling?

14      A.    Just making some noise.  He was making noise.

15  It was like the growl kind of thing, I did the pirate

16  "rrrrrrr".

17      Q.    Okay.  And you heard him -- whatever the noise

18  was, you heard it on the video too; right?  You could

19  hear him?

20      A.    I believe it was on there.  But he was -- he

21  never made any effort to communicate with us.  We

22  tried to ask him his name, ask for ID.  He wasn't

23  giving us anything.

24      Q.    Okay.  And so why did you put your knee on his

25  neck?



1201 West Peachtree Street
Suite 2300
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

1    A.    I had my knee on his upper back, just to

2   control him.

3    Q.    Um-hum.   And at some point, was he on his

4   back?  Was he always on his stomach when you were

5   applying --

6    A.    When we were handcuffing and searching him, he

7   was on his stomach.   Once we had him cuffed, the

8   handcuffs double-locked and he was cleared, I believe

9   Deputy Sturdevant rolled him up on his side and held

10  him up in that position.

11   Q.    Did you -- when you -- you put this -- as far

12  as the when you put the knee on him, what would you

13  call that?  Just kind of a pressure-hold or you were

14  just trying to pin him down, so he wouldn't move?

15  What was the objective there?

16   A.    We were just trying to keep him still, so we

17  could get the job done.

18   Q.    Okay.  Were you still doing that after -- or

19  did you do it some more after he got rolled over?

20   A.    Onto his back?

21   Q.    Um-hum.  (Indicating in the affirmative)

22   A.    No, sir.

23   Q.    Okay.  On the video, it looks like there's two

24  different times where you put a knee on him.  It's

25  like you do it at first for a few seconds or so.  And



GREG DYKSMA, et al.  vs. DEPUTY TOMMY PIERSON, et al.
DEPUTY TOMMY PIERSON on 10/19/2017

DEPOSITION OF
Page 36

1   then at one point, you change position and then you

2   do it again for, you know, a longer period.  Do you

3   know why you changed position?

4          MR. WILLIAMS:  Object to the form to the

5       extent it mischaracterizes what the video shows,

6       because I think the first time is a little longer

7       than the second time.

8          MR. JONES:  That may be right.

9          MR. WILLIAMS:  But they are both pretty

10      short.

11         BY MR. JONES:

12   Q.   There were two different distinct - you are in

13   two different positions and without -- the time is

14   shown by the video, so I won't speculate about that.

15         But at first, you have a knee on him, and then

16   you kind of changed positions, and then you put a

17   knee on him again.  Do you know why you changed

18   positions?

19   A.   From one side of him to the other?

20   Q.   Yes.

21   A.   Is that what you are talking about?

22   Q.   I think that's what it was.  Yeah.

23   A.   Okay.  I don't know why I went from one side

24   to the other unless, I mean, just the whole thing was

25   -- it was a dynamic situation.



1    Q.    Right.

2    A.    So I don't know if somebody asked me to go

3  around to the other side or why I may have moved, I

4  don't know.

5    Q.    And I'm just -- I mean, was it just a comfort

6  thing, you know, you wanted to change knees or was it

7  a balance thing or --

8    A.    I maintain my balance very well all the time.

9  I know I wasn't off balance.  I had most of my weight

10 on my other leg, and that one was just on him to make

11 sure he wasn't pulling up and trying to pull away.

12   Q.    You were basically holding yourself up with

13 your other leg and then you were putting the knee on

14 him to hold him down?

15   A.    Right.  As he would push against my knee, I'd

16 push back against him.

17   Q.    And you said it was the upper back.  Do you

18 think that it was also a part of the neck?

19   A.    I don't believe it was, but.

20   Q.    Okay.  Did anybody tell you -- did any of the

21 other officers there tell you, you know, to stop

22 doing that at some point?

23   A.    No, sir.

24   Q.    Did anybody kind of wave you off?

25   A.    No, sir.



1    Q.   As far as the movement -- as far as, you know,

2    you being in two different positions when you have a

3    knee on him, would you agree that one of the times is

4    more visible on the camera than the other time, just

5    because of the position of the body?

6    A.   Yes, sir.

7    Q.   And were you at all conscious of the whether

8    -- of the cameras or anything when you were doing

9    this --

10   A.   No.

11   Q.   -- as far as wanting to either show what's

12   going on or not show what's going on?

13   A.   No, sir.

14   Q.   Okay.  So how long all total would you say you

15   had a knee on his upper back or whatever you describe

16   it?

17   A.   As you said, the video shows the time, so I

18   don't want to speculate, but.

19   Q.   Right.  At some point, when you were doing

20   that, did you notice that he stopped making noise?

21   A.   He was still making a little bit.  He was

22   breathing heavy.  He was -- he wasn't doing that

23   grunting growl type sound, but he was breathing heavy

24   and made some little noises.

25   Q.   When he was breathing heavy, was the breathing



1    itself making noise?  I mean, was he just breathing

2    heavy or was it like -- did you hear it like a

3    retching kind of thing noise?

4       A.    It just sounded like he was out of breath.

5       Q.    Just out of breath?

6       A.    Winded.

7       Q.    Yeah.  And what were the other officers doing

8    when you -- you were positioned at the upper end of

9    his body where you were holding him down with the

10   knee.  How were the other officers holding him down?

11      A.    I don't know.

12      Q.    Did you see anybody with the knee on his lower

13   back or anywhere else on him?

14      A.    I don't recall.

15      Q.    Okay.  Just the technique of holding him down

16   with your knee, was that something you were trained

17   to do?

18      A.    No.

19      Q.    It was just something that kind of seemed

20   natural in that incident?

21      A.    Yes, sir.

22      Q.    You had two hands, I mean, why would you use a

23   knee as opposed to your hands to hold him down?

24      A.    I was keeping my hands available for other

25   things.



1    Q.    Were you involved in as far as -- what did you

2    need your hands for at that point?

3    A.    Well, I didn't know what I might need them

4    for.

5    Q.    Got you.  Somebody else was cuffing him;

6    right?

7    A.    I believe, Deputy Dawson was the one that

8    actually put the handcuffs on him, but I was -- I did

9    have an arm while he was doing that.

10   Q.    Right.  You didn't personally search him, did

11   you?

12   A.    No, sir.  I don't believe so.

13   Q.    So you were basically there just to keep him

14   from moving; right?

15   A.    Until the search was done.

16   Q.    Were you trying to keep -- when you were

17   putting pressure on his upper body, were you trying

18   to keep him from moving his lower extremities?

19   A.    No, sir.  I was just up on the upper body.

20   Q.    You were just trying to keep him from like

21   being able to sit up or get up?

22   A.    Right.  To roll over or to sit up or --

23   Q.    And you didn't have to worry about his hands

24   because he was already cuffed at that point; right,

25   when you were holding him down?



1    A.    I believe so, yes.

2    Q.    Okay.  So once he was cuffed, what was the

3  point of continuing to hold him down as opposed to

4  just going ahead and put him in the back seat of a

5  patrol car?

6    A.    Well, he wasn't searched until after he was

7  cuffed.  So once the search was complete, then --

8  that's when, I think, Deputy Dawson and myself walked

9  away from him and Deputy Sturdevant stayed with him.

10    Q.    Okay.

11    A.    So once the search of his person was complete,

12  that's when we stepped away.

13    Q.    At some point, were you aware that he just

14  stopped resisting, stopped moving?

15    A.    It wasn't until we were done.  I know that

16  while I was holding his upper, if I would just shift

17  my weight a little bit, any time I took any pressure

18  off of him, he was pushing up on me and trying to

19  lift his upper body, so it was after we had completed

20  that.

21    Q.    You never heard him say anything like, "I

22  can't breathe" or anything like that, did you?

23    A.    No, sir.

24    Q.    But you said he was breathing heavily?

25    A.    He was -- he was breathing, yes.



DISCOVERY
LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

1201West Peachtree Street
Suite 2300
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

1      Q.    Okay.  At some point, you noticed that he was

2   no longer breathing?

3      A.    We continued to check for breathing and pulse.

4   He was non-responsive.  At one point, I don't know

5   who noticed, but one of the deputies, either Dawson

6   or Sturdevant, said something about an ammonia pack,

7   and they tried to bring him back to his senses that

8   way.

9      Q.    Smelling salts?

10     A.    The smelling salts, right.  But I don't know

11  -- I don't remember exactly which one that was.

12     Q.    And that was done before anybody called an

13  ambulance; right?

14     A.    The ambulance --

15     Q.    Or was the ambulance already on the way

16  because of the Taser?

17     A.    I believe it was.

18     Q.    Okay.

19     A.    That's something that 911 would have to verify

20  with their records.

21     Q.    Now, let me ask you this.  Was y'all's

22  standard procedure at Harris County to call an

23  ambulance any time you put Taser darts in somebody?

24     A.    Yes, sir.

25     Q.    And why is that?



1201 West Peachtree Street
Suite 2300
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

1    A.    For them to remove the prongs.

2    Q.    Okay.  So and that's automatic, any time you

3  tase somebody with a -- is it just in dart mode that

4  you call an ambulance?

5    A.    In what mode?

6    Q.    Dart mode?

7    A.    Dart mode?  Oh, with the deployment of it?

8    Q.    Right.

9    A.    Yes, as far as I know.

10   Q.    Because you know there is also, you know,

11 there's also a stun mode you use?

12   A.    The drive stun.

13   Q.    The drive stun.  And that basically is just

14 for pain compliance, but it's noninvasive, it doesn't

15 put anything in the body or anything; right?

16   A.    Just electricity.  Right.

17   Q.    And it doesn't leave a dart or anything like

18 that?

19   A.    Right.

20   Q.    So if you -- if you drive stun somebody and

21 then they comply and you make an arrest, you have to

22 -- you have to do a report that you used a Taser,

23 but, you know, you don't automatically call an

24 ambulance for that, do you, unless the person seems

25 to be injured?



1    A.    If they request one, obviously we would.  If

2    they seem to be injured, we would.

3    Q.    Right.

4    A.    I don't believe so.  I never used my Taser for

5    any purpose, so.

6    Q.    You've never had to deploy --

7    A.    I've never deployed it or drive stun.

8    Q.    But you were certified in it?

9    A.    I did -- I had one, I just did not use it.

10   Q.    Right.  But you were trained in Taser,

11   certified in Taser, you had a Taser.  But that wasn't

12   -- that wasn't your role in this incident?

13   A.    No, sir.

14   Q.    Okay.  And so, I guess, what I'm getting at is

15   that the ambulance was called because the Taser darts

16   needed to be removed.  And y'all would do that

17   automatically whether he asked for it or whether he

18   appeared to be in need of medical attention or not;

19   right?

20   A.    That's my understanding of what happened.

21   Q.    It's kind of like taking a fish hook out;

22   right?

23   A.    Yeah.

24   Q.    You don't want to -- you don't want your drunk

25   uncle to do it, you want to -- you want a nurse to do



```
 1   it if you can't.  You want your mom to do it.

 2     A.   Right.

 3     Q.   So they -- how did they go about -- is there a

 4   particular signal or a code that's used on the radio

 5   for "okay, we need an ambulance", for when you need

 6   an ambulance for the sole purpose of removing Taser?

 7     A.   No, sir.  I don't recall a specific code.  I

 8   know Harris County uses a lot of plain talk, just

 9   like I'm talking to you.

10        We did have some codes that we would use.  But

11   for a situation like that, nothing that I know of as

12   far as specific codes, just plain talk.

13     Q.   Okay.  And there was -- did you hear the radio

14   traffic about the ambulance being requested?

15     A.   I don't remember hearing any radio traffic.

16     Q.   Do you remember hearing anybody there at the

17   scene talk on the radio about the require -- had him

18   -- requesting him an ambulance?

19     A.   I know that Sergeant Harmon told me that there

20   was one on the way.

21     Q.   And he is the one that used the Taser; right?

22     A.   Yes, sir.

23     Q.   So he would naturally be the one to do it?

24     A.   Right.  At some point, I know he told me that

25   there was one on the way.
```



GREG DYKSMA, et al.  vs. DEPUTY TOMMY PIERSON, et al.
DEPUTY TOMMY PIERSON on 10/19/2017

DEPOSITION OF
Page 46

1    Q.    Okay.  Do you remember any calls on radio

2  where the dispatcher and other officers were radioing

3  in, expressing concern because they didn't know who

4  needed the ambulance?

5    A.    Not at that time.

6    Q.    Later on, did you --

7    A.    All the -- all the officers on the shift were

8  on the scene.

9    Q.    Right.

10   A.    But later, one of the 911 dispatchers told me

11 that when the ambulance was requested, they thought

12 it was me that needed it.

13   Q.    Right.  And do you know why there was some, I

14 guess, there was kind of several minutes of confusion

15 where no one would actually -- no one actually went

16 on there and said, "Who it was that needed the

17 ambulance?"  Are you aware of that?

18   A.     I know that Sergeant Harmon said over the

19 radio that I had been hit.  I think, he used the word

20 or the term "rammed".

21   Q.    Talking about the car?

22   A.    The car.  I think, he said rammed.  But again,

23 you know, I wasn't -- my responsibility wasn't radio

24 communication at that time.

25   Q.    Right.



1    A.    And like I said, it wasn't until later that

2    the dispatcher actually told me they thought it might

3    have been for me because they had not heard me over

4    the radio.

5    Q.    Got you.

6    A.    And they weren't sure if the ambulance was for

7    me or the -- Mr. Dyksma.

8    Q.    And didn't -- wasn't the watch commander or

9    whoever it was, didn't they come on and say, you

10   know, "Is it one of us?"; do you remember that?

11   A.    I don't remember.

12   Q.    Okay.  In any event, they got the ambulance

13   there pretty quick; right?

14   A.    I don't know how long it took.  I know, you

15   know, it seemed like everything in one way seemed

16   really fast, in another way, it seemed really slow.

17   It was just kind of a weird situation.

18   Q.    Okay.  But you knew -- y'all knew the

19   ambulance was on the way when y'all noticed that

20   Mr. Dyksma was unresponsive; right?

21   A.    Right.

22   Q.    And did y'all -- did any of y'all do any kind

23   of CPR to try to resuscitate him before the ambulance

24   got there?

25   A.    Yes.  Sergeant Harmon actually requested that



1   the ambulance step it up, get there quicker, and told

2   them that, you know, he was unresponsive.

3       Q.   And there was still some confusion at that

4   point about who it was that was unresponsive?

5       A.   I don't know.

6       Q.   You weren't on the radio; right?

7       A.   I don't remember the radio transmissions.  I

8   was focused on the scene.

9       Q.   Okay.

10      A.   But at some point, one of the other officers

11  suggested we move him to the road, the blacktop, and

12  start CPR or start compressions.

13      Q.   Why the blacktop instead of the soft ground?

14  I'm not a -- I'm not trained in it, so I'm just

15  curious.

16      A.   Well, from what they said was let's get him on

17  hard flat surface.

18      Q.   It's easier to do compressions if they are on

19  a flat surface?

20      A.   I guess.  And you don't have rocks and stuff

21  sticking up in the back either.

22      Q.   Oh, yeah.

23      A.   I mean, it was not at the -- the shoulder was

24  sloped.

25      Q.   Do you have the CPR training?



1201 West Peachtree Street
Suite 2300
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

1      A.    No, sir.

2      Q.    Okay.  And of the officers that were there, do

3  you know who did?

4      A.    I don't.

5      Q.    Who was actually doing the compressions?

6      A.    I believe, Sergeant Harmon may have started.

7  And then when he got tired, I did the compressions

8  and then Deputy Sturdevant, I want to say, took over

9  until the ambulance got there.

10     Q.    So you did the compressions, even though you

11 weren't trained in it, just because you've seen it

12 done?

13     A.    Yes, sir.

14     Q.    Okay.  And y'all -- what did you do, like a

15 hundred times and then switch off?

16     A.    I don't know how many we did.

17     Q.    You just kept doing it?

18     A.    You know, we tried to keep a good rhythm going

19 and trying to help the guy.  It was pretty much until

20 you get tired.

21     Q.    Yeah.  At some point, before the ambulance got

22 there, did you get the sense that it wasn't working

23 and that it was useless and then y'all -- there

24 wasn't anything else that y'all could do?

25     A.    No, we continued on until the ambulance got



DISCOVERY
LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

1201 West Peachtree Street
Suite 2300
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

1   there.  We did our best to help him out.

2       Q.   Okay.  And do you know when the ambulance guys

3   got there, when the paramedics got there, do you know

4   if he was alive at that point?  Did anybody say

5   anything about whether there was a heartbeat or

6   whether he was breathing or anything?

7       A.   I have no idea.

8       Q.   Okay.  How long were the paramedics there?

9   Was it a quick load and go or did they spend a lot of

10  time working on him?

11      A.   They spent some time, I don't know if it was a

12  lot or not, but you'd have look at the records, I

13  don't know.

14      Q.   Do you know if -- was it your understanding

15  that he was dead when they left the scene?

16      A.   Nobody told me that.

17      Q.   Okay.  When did you find out that he had died?

18      A.   It was several hours later when I found out.

19      Q.   And where were you when you found out?

20      A.   I believe, I was at the Sheriff's Office.

21      Q.   And just curious, what were you doing there?

22      A.   Writing reports.

23      Q.   Writing reports about this incident?

24      A.   Right.

25           MR. JONES:  You know what, do you have a copy



1   of his report?  I brought this briefcase for the

2   sole reason that it had a copy of the report in

3   it, you know, that folder I had last time, and I

4   didn't -- I wanted to make his report an exhibit

5   if we can.

6       He did the basic incident report, I think.

7   Everybody else's was supplemental, I think about

8   two or three pages.  I think that's it, the top on

9   there, isn't it?

10      MR. WILLIAMS:  No, it's -- well.  This one has

11  got a lot of writing and stuff on it.

12      MR. JONES:  Oh, it's gotten marks on it.

13      MR. WILLIAMS:  Yeah.

14      MR. JONES:  I understand.  We can always

15  stipulate, if you don't mind, we'll just -- I can

16  email it to the court reporter?

17      MR. WILLIAMS:  You can just put that you want

18  his incident report attached as exhibit whatever

19  --

20      MR. JONES:  Yeah.  His incident report, we

21  will stipulate that it's Exhibit 1.

22      MR. WILLIAMS:  And I will certainly stipulate

23  to the authenticity if it's got his name on it,

24  obviously.

25      MR. JONES:  Right.



```
 1          BY MR. JONES:
 2     Q.    So have you looked at your report recently?
 3     A.    I've looked over it a few days ago.  Yes, sir.
 4     Q.    And when you looked at it and then when you
 5  saw the video today, did it seem like your report was
 6  consistent with what you saw on the video or was
 7  there anything different than the way you remember
 8  it?
 9     A.    I believe for the most part, it was
10  consistent.  I didn't look at the report and the
11  video at the same time.
12     Q.    I understand.
13     A.    And that was -- you know, like I said, it was
14  a dynamic situation.  It was very -- it was a lot
15  going on.
16     Q.    Yeah.  And there wasn't anything that stuck
17  out to you like, "Oh, I didn't realize that when I
18  did the report", you know, because of cameras in a
19  different angle than you were?  You know, it wasn't
20  anything -- you didn't have any moments where you
21  said, "Oh, I got that wrong" or anything like that?
22     A.    Not that I recall.
23     Q.    Okay.  This -- you said before that the whole
24  shift was basically out there; right?
25     A.    Yes, sir.
```



GREG DYKSMA, et al.  vs. DEPUTY TOMMY PIERSON, et al.
DEPUTY TOMMY PIERSON on 10/19/2017

DEPOSITION OF
Page 53

1    Q.    And that was you, Harmon, Sturdevant and --

2    A.    Dawson.

3    Q.    Dawson.  And were y'all -- at the time that

4    you found out about the pursuit, were y'all basically

5    just all on patrol or was somebody coming from

6    another scene or do you know?

7    A.    I believe, we were just all on patrol.

8    Q.    And, I guess, y'all were fairly close by;

9    right, within maybe 5 minutes?

10   A.    Sergeant Harmon and I were the closest.  I

11   don't think Dawson and Sturdevant were very close

12   when the call first came out.

13   Q.    I'm just curious, I mean it's all -- that

14   every deputy that's working the entire county gets

15   there pretty quick.  I mean, was most of the patrol

16   activity kind of concentrated in that area because

17   it's more populous?

18   A.    Well, it's more centralized.

19   Q.    More centralized.

20   A.    It's easy to get to -- if there is a call on

21   the east side of the county, the westsouth or

22   northsouth, it's -- you know, if you are central, you

23   can have a good shot to getting somewhere.

24         But I think, Sergeant Harmon and I were both

25   over on the east side.  I want to say Deputy Dawson



DISCOVERY
LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

1201 West Peachtree Street
Suite 2300
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

1    may have been north, and Sturdevant toward the west.

2    We had zones we worked.

3         Q.    Okay.  So you're running a radar or anything

4    or you're just basically riding around, waiting for

5    calls?

6         A.    That time of the night, on a weeknight, it was

7    very, very little traffic.  We were just patrolling

8    around.  If the call came out, we would answer it.

9         Q.    Okay.  Do you know if you got any other calls

10   that evening?

11        A.    I don't remember.

12        Q.    Okay.  How long had you -- first of all, what

13   were the hours of that shift?

14        A.    6:00 p.m. to 6:00 a.m.

15        Q.    6:00 to 6:00.  So like some weeks you'd work

16   three days and some you'd work four; is that --

17        A.    It was a three, two, two, three schedule.

18        Q.    Okay.  So it averaged out like, you know, 40,

19   but some weeks you'd work --

20        A.    Right.

21        Q.    -- more, some weeks you'd work less?

22        A.    Right.

23        Q.    So how long had you worked on that shift?  Had

24   you been on that shift the whole time you'd been with

25   the department?



1201 West Peachtree Street
Suite 2300
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

1    A.    On the night shift?

2    Q.    Yeah.  Is that what they call it?

3    A.    Well, we've been days and nights and rotate

4   every, I want to say, 10 weeks from days to nights.

5    Q.    Okay.  So you didn't -- you didn't stay on

6   that -- on one shift continuously, you would rotate

7   different shifts?

8    A.    Right.  The whole -- the whole shift, as far

9   as the people, would change from days to nights.

10    Q.    Okay.  But your shift was the same guys;

11   right?

12    A.    The same guys, just we were rotating.

13    Q.    Different times.  So you were working with --

14   you guys basically were a team, y'all knew each

15   other, you worked together?

16    A.    Right.

17    Q.    Unless somebody had time off or something,

18   y'all would always be working the same shift; right?

19    A.    Yes, sir.

20    Q.    And was that true the entire year and a half

21   that you were here, that you were working with those

22   same four guys?

23    A.    People would come and go.  Deputy Sturdevant,

24   I think, at that time was new to our shift.  And that

25   was just the decision of the supervisors as far as if



GREG DYKSMA, et al.  vs. DEPUTY TOMMY PIERSON, et al.
DEPUTY TOMMY PIERSON on 10/19/2017

DEPOSITION OF
Page 56

```
1    they needed to rearrange who was on what shift.
2        Q.   Did any of those officers testify against you
3    in the criminal case?  Or did they testify in the
4    criminal case, I should say?
5        A.   Sergeant Harmon spoke.
6        Q.   Okay.  When you say spoke, you mean he was
7    called as a witness and was asked questions?
8        A.   Yes.
9        Q.   And did he -- you were there obviously; right?
10       A.   Yes, sir.
11       Q.   And did he say that he was aware of any of the
12   activities that you were being, you know, accused of?
13       A.   In the trial?
14       Q.   Yeah.
15       A.   I mean, he knew why he was there.
16       Q.   I guess what I am saying is I'm asking you
17   about what he testified to, the gist of what he
18   testified to.
19       A.   I'm not sure I understand exactly what you are
20   looking for.
21       Q.   Let me just try to put it as simple as I can.
22   He testified as a witness for the -- for you or for
23   the prosecution?
24       A.   Prosecution.
25       Q.   Okay.  And what kind of stuff did the
```



DISCOVERY
LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

1201West Peachtree Street
Suite 2300
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

```
1    prosecution ask him?

2       A.   You'd have to look at the court transcripts.

3       Q.   Well, there won't be a court transcript unless

4    somebody buys one.  You said you are not appealing,

5    are you?  Or maybe you don't know and that decision

6    hadn't been made?

7       A.   Yeah.  And my lawyer is not here for that

8    case, so.

9       Q.   I understand.  I got you.

10      A.   I don't want to answer any questions on that.

11      Q.   Okay.  Let me ask you this.  What did -- what

12   do you remember Harmon saying on the witness stand or

13   what did it seem like they were trying to get him to

14   say on the witness stand?

15      A.   Again, I don't want --

16           MR. WILLIAMS:  Object to the form.  I don't

17       understand what relevance, and I think, he is

18       going to plead the 5th as to any discussion of

19       what transpired in the criminal trial or anything

20       about the criminal charges.

21           DEPONENT PIERSON:  Right.  Without my attorney

22       here, I'm not going to speak about that trial.

23           MR. JONES:

24      Q.   Let me ask it this way.  And you know, if you

25   want to take the 5th to it, we can move on.  But I'm
```



1  entitled to ask the question.

2    A.    Sure.

3    Q.    And here's the question.  Were any of the

4  other officers on the shift aware that you were, you

5  know, you were spending time or getting attention

6  from any of the women that you would stop on the

7  road?

8    A.    I take the 5th.

9    Q.    You are going to take the 5th on that?

10    A.    (Indicating in the affirmative)

11    Q.    Because what I'm getting at is -- I'm not

12  asking you if you did anything wrong, I'm basically

13  asking you did they know, were they aware of any of

14  these situations where the women accused you?  Were

15  they aware that you'd stopped certain people and were

16  they aware that the allegations were being made at

17  the time and all that?

18    A.    Again, the 5th.

19    Q.    You are going to take the 5th on that?

20    A.    Yes, sir.

21    Q.    Okay.  Let me ask you this.  As we sit here

22  today, you have a felony conviction; right?

23    A.    Yes.

24    Q.    And you haven't been sentenced yet, so I mean,

25  you might get First Offender.  I guess, you don't



1201West Peachtree Street
Suite 2300
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

GREG DYKSMA, et al.  vs. DEPUTY TOMMY PIERSON, et al.
DEPUTY TOMMY PIERSON on 10/19/2017

DEPOSITION OF
Page 59

1   know whether -- you don't know exactly what the

2   status is going to be permanently, do you?

3       A.   No, I don't.  No, sir.

4       Q.   At this point, all we know was that the jury

5   has convicted you of certain charges and they have --

6   they found you not guilty of other charges; right?

7       A.   Yes.

8       Q.   What are the -- when you go to court to be

9   sentenced today, what are the charges that you were

10  convicted of, that you are supposed to find out your

11  sentence all today?

12          MR. WILLIAMS:  I mean, whatever that is we can

13     get copies of the documents.

14          MR. JONES:  I understand it.

15          MR. WILLIAMS:  I don't know why he needs to

16     answer those questions really.

17          MR. JONES:

18      Q.   Well, you have been con -- I'm trying to avoid

19  to have to get the certified copies and all that

20  crap.  Can you tell me what you've been convicted of

21  and whether they are felonies or misdemeanors?  And

22  if you are not sure -- I mean, I know, there are

23  multiple charges and maybe you don't remember --

24          MR. WILLIAMS:  We will get a certified copy of

25     it.



1          MR. JONES:  You want to get a certified copy?

2          MR. WILLIAMS:  Yes.  It's easy for me to have

3      it done, so we will know for sure.

4          MR. JONES:  If you can do that, that would be

5      greet.  And likely, there is a good chance that,

6      you know, some of them will be admissible for

7      impeachment and some of them won't.  That's -- we

8      just have to wait and see.

9          But, yeah, if you can get that to me, I won't

10     ask him any more questions about it.

11         MR. WILLIAMS:  Sure.  Yeah.  No problem.

12         BY MR. JONES:

13  Q.   So you are not going to tell me whether you

14  are guilty of the crimes that they convicted you of,

15  are you?

16  A.   5th.

17  Q.   You take the 5th on that?

18  A.   Yes.

19  Q.   Do you think that you did anything that caused

20  Nicholas Dyksma to die?

21  A.   No, sir.

22  Q.   You don't think that you killed him?

23  A.   No, sir.

24  Q.   Or helped kill him?

25  A.   No, sir.



1    Q.    Okay.

2          MR. JONES:  That's all I got.

3          MR. WILLIAMS:  Okay.

4          MR. JONES:  Do you need to ask him anything

5    while -- I know it would be unconventional, but.

6          MR. WILLIAMS:  No.

7          MR. JONES:  We don't know how accessible he

8    will be.  I'm rooting for you, but you know.

9          MR. WILLIAMS:  No, I'm good.

10

11          (DEPOSITION CONCLUDED AT 11:47 A.M.)

12

13

14

15

16

17

18

19

20

21

22

23

24

25



Case 4:17-cv-00041-CDL   Document 40   Filed 05/15/18   Page 63 of 81

GREG DYKSMA, et al.  vs. DEPUTY TOMMY PIERSON, et al.                    DEPOSITION OF
DEPUTY TOMMY PIERSON on 10/19/2017                                              Page 62

1    STATE OF GEORGIA

2    COUNTY OF MUSCOGEE

3

4

5                    C E R T I F I C A T E

6

7

8            The forgoing transcript of the proceedings

9    was taken before me as a Certified Court Reporter

10   in and for the State of Georgia and reduced to

11   typewriting under my direction and supervision, and

12   I certify that it is a true and correct transcript

13   to the best of my ability of the proceedings.

14

15

16              This 29th day of October, 2017.

17

18   

19   _____

20              Inna Russell

21              Certified Court Reporter

22              No. 5988-9757-0978-2016

23

24

25

DISCOVERY
LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

1201 West Peachtree Street
Suite 2300
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

GREG DYKSMA, et al.  vs. DEPUTY TOMMY PIERSON, et al.
DEPUTY TOMMY PIERSON on 10/19/2017

DEPOSITION OF
Page 63

```
 1          COURT REPORTER'S DISCLOSURE STATEMENT

 2

 3          I, INNA RUSSELL, Georgia Certified Court

 4     Reporter, Certificate Number 5988-97-57-0978-2017,

 5     in compliance with Code Section 9-11-28 and Code

 6     Section 15-14-37, make the following disclosure

 7     about all arrangements, financial and otherwise,

 8     involving the foregoing deposition:

 9

10  1.)    I was contacted directly by telephone

11  regarding scheduling of the deposition as to date,

12  time and place by the office of the scheduling

13  attorney, or received a message from the office of

14  the scheduling attorney by answering machine and

15  returned the call, with scheduling of the deposition

16  as to date, time and place confirmed, and no prior

17  financial arrangements were negotiated between

18  counsel and myself.

19

20          This 19th day of October, 2017.

21

22

23

24          Inna Russell, CCR #5988-9757-0978-2017

25
```

**DISCOVERY**
**LITIGATION SERVICES**
Court Reporting • Videography • Trial Presentations

Nationwide Coverage

1201West Peachtree Street
Suite 2300
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

Case 4:17-cv-00041-CDL   Document 40   Filed 05/15/18   Page 65 of 81

GREG DYKSMA, et al.  vs. DEPUTY TOMMY PIERSON, et al.                                    DEPOSITION OF
DEPUTY TOMMY PIERSON on 10/19/2017                                                            Page 64

```
1              DEPOSITION ERRATA SHEET

2    Assignment No. 37477

3    Case Caption:  GREG DYKSMA, et al.

4    vs.  DEPUTY TOMMY PIERSON, et al.

5    Witness: Deputy Tommy Pierson - October 19, 2017

6

7         DECLARATION UNDER PENALTY OF PERJURY

8         I declare under penalty of perjury

9    that I have read the entire transcript of

10   my Deposition taken in the captioned matter

11   or the same has been read to me, and

12   the same is true and accurate, save and

13   except for changes and/or corrections, if

14   any, as indicated by me on the DEPOSITION

15   ERRATA SHEET hereof, with the understanding

16   that I offer these changes as if still under

17   oath.

18         Signed on the _____ day of

19   _____, 20____.

20   _____

21         Deputy Tommy Pierson

22   Sworn to and subscribed before me this _____ day
     of _____, 20__.
23   _____

24   Notary Public

25   My commission expires_____
```



1201 West Peachtree Street
Suite 2300
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

1                    DEPOSITION ERRATA SHEET

2      Page No._____Line No._____Change to:_____

3      _____

4      Reason for change:_____

5      Page No._____Line No._____Change to:_____

6      _____

7      Reason for change:_____

8      Page No._____Line No._____Change to:_____

9      _____

10     Reason for change:_____

11     Page No._____Line No._____Change to:_____

12     _____

13     Reason for change:_____

14     Page No._____Line No._____Change to:_____

15     _____

16     Reason for change:_____

17     Page No._____Line No._____Change to:_____

18     _____

19     Reason for change:_____

20     Page No._____Line No._____Change to:_____

21     _____

22     Reason for change:_____

23

24     SIGNATURE:_____  DATE:_____

25                  Deputy Tommy Pierson



1201 West Peachtree Street
Suite 2300
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

GREG DYKSMA, et al.  vs. DEPUTY TOMMY PIERSON, et al.
DEPUTY TOMMY PIERSON on 10/19/2017

DEPOSITION OF
Page 66

1          DEPOSITION ERRATA SHEET

2    Page No._____Line No._____Change to:_____

3    _____

4    Reason for change:_____

5    Page No._____Line No._____Change to:_____

6    _____

7    Reason for change:_____

8    Page No._____Line No._____Change to:_____

9    _____

10   Reason for change:_____

11   Page No._____Line No._____Change to:_____

12   _____

13   Reason for change:_____

14   Page No._____Line No._____Change to:_____

15   _____

16   Reason for change:_____

17   Page No._____Line No._____Change to:_____

18   _____

19   Reason for change:_____

20   Page No._____Line No._____Change to:_____

21   _____

22   Reason for change:_____

23

24   SIGNATURE:_____  DATE:_____

25             Deputy Tommy Pierson



GREG DYKSMA, et al.  vs. DEPUTY TOMMY PIERSON, et al.                    DEPOSITION OF
DEPUTY TOMMY PIERSON on 10/19/2017                                       Index: 1..applying

**Exhibits**

**37477 Pierson.
Tommy Plaintiff'
s Exhibit 1** 4:4
  51:21

___

**1**

**1** 51:21

**10** 55:4

**11:47** 61:11

**16** 10:12

**19** 6:2

___

**2**

**2015** 10:9

**2017** 6:2

**208** 20:2,10
  22:16,20,22

**27** 13:11 16:20
  18:4 20:2

**2:00** 19:7

___

**3**

**315** 12:25 13:9

___

**4**

**40** 54:18

___

**5**

**5** 53:9

**55** 20:20,22

**5th** 57:18,25
  58:8,9,18,19

60:16,17

___

**6**

**60** 20:21

**6:00** 54:14,15

___

**8**

**80** 20:19 21:10

___

**9**

**911** 12:6 42:19
  46:10

___

**A**

**a.m.** 54:14
  61:11

**ability** 26:7

**able** 27:19 28:1
  31:11 40:21

**about** 7:18 8:21
  9:21,22,23,24
  10:15 11:25
  12:1,5 13:1
  16:23 19:18
  20:25 28:20
  32:4,5 36:14,
  21 40:23 42:6
  45:3,14,17
  46:21 48:4
  50:5,23 51:7
  53:4 56:17
  57:20,22 60:10

**accelerate**
  18:24

**accelerated**
  22:24

**accessible** 61:7

**accurate** 18:1

**accused** 56:12
  58:14

**across** 18:2

**active** 7:8,9

**activities** 56:12

**activity** 53:16

**actually** 8:15
  10:20 15:4
  19:7,24 21:6
  27:17 40:8
  46:15 47:2,25
  49:5

**admissible** 60:6

**advance** 19:12

**advised** 18:8,9

**affected** 33:7

**affirmative**
  35:21 58:10

**after** 10:10
  23:24 25:2,12
  27:2 28:11
  33:19 35:18,19
  41:6,19

**again** 15:22
  22:24 25:3
  31:16 32:7
  36:2,17 46:22
  57:15 58:18

**against** 33:21
  37:15,16 56:2

**ago** 52:3

**agree** 38:3

**agreeable** 6:11,
  12

**agreement** 6:7

**ahead** 6:14
  16:5 22:4 41:4

**air** 9:16

**alive** 50:4

**all** 6:5,8 8:9
  9:3,7 14:15
  16:18 18:17
  20:16,24 22:13
  37:8 38:7,14
  46:7 53:5,7,13
  54:12 58:17
  59:4,11,19
  61:2

**allegations**
  58:16

**allowed** 6:6

**almost** 32:10

**alongside**
  22:17

**already** 8:19
  13:18 14:2
  17:5 18:10
  26:1 27:18
  28:12 40:24
  42:15

**also** 18:13
  37:18 43:10,11

**always** 26:9,10
  35:4 51:14
  55:18

**am** 56:16

**ambulance**
  42:13,14,15,23
  43:4,24 44:15
  45:5,6,14,18
  46:4,11,17
  47:6,12,19,23
  48:1 49:9,21,
  25 50:2

**ammonia** 42:6

**anesthetized**
  32:21

**angle** 52:19

**another** 19:10
  26:10 47:16
  53:6

**answer** 6:10
  54:8 57:10
  59:16

**anybody** 8:7,18
  37:20,24 39:12
  42:12 45:16
  50:4

**anymore** 10:25

**anything** 8:7,22
  16:1,5 19:25
  24:20,25
  29:14,15 30:4
  31:17 34:23
  38:8 41:21,22
  43:15,17 49:24
  50:5,6 52:7,16,
  20,21 54:3
  57:19 58:12
  60:19 61:4

**anyway** 28:5
  29:2

**anywhere**
  39:13

**appeal** 7:12

**appealing** 57:4

**appear** 30:24
  32:13,19

**appeared** 44:18

**application**
  8:17

**applying** 35:5



**DISCOVERY
LITIGATION SERVICES**
Court Reporting • Videography • Trial Presentations

Nationwide Coverage

1201 West Peachtree Street
Suite 2300
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

**approached** 22:16

**approaching** 16:24

**approximately** 7:21,22 10:5 12:22

**approximation** 20:12

**area** 12:25 15:9 53:16

**arm** 40:9

**around** 7:18 13:20 14:18 15:3 17:14 19:6 21:12 29:17,18 37:3 54:4,8

**arrest** 43:21

**arrived** 28:14

**ask** 34:22 42:21 57:1,11, 24 58:1,21 60:10 61:4

**asked** 37:2 44:17 56:7

**asking** 8:21 12:9 14:19 56:16 58:12,13

**assistance** 12:9

**assisted** 28:13

**assume** 10:16

**attached** 51:18

**attempt** 18:7

**attention** 44:18 58:5

**attorney** 57:21

**August** 10:8

**authenticity** 51:23

**authority** 21:17

**automatic** 43:2

**automatically** 43:23 44:17

**available** 39:24

**averaged** 54:18

**avoid** 59:18

**aware** 41:13 46:17 56:11 58:4,13,15,16

**away** 14:6 24:24 37:11 41:9,12

___

**B**

**back** 7:14 14:20 33:15,21 35:1,4,20 37:16,17 38:15 39:13 41:4 42:7 48:21

**backed** 24:10

**backup** 18:14

**balance** 37:7,8, 9

**base** 10:21

**basic** 51:6

**basically** 10:13 14:11,20 17:21 18:18 19:8 20:9,24 21:4 26:3 30:9

33:24 37:12 40:13 43:13 52:24 53:4 54:4 55:14 58:12

**basis** 9:18

**became** 13:21

**because** 17:5 18:13 23:8 27:10 36:6 38:5 40:24 42:16 43:10 44:15 46:3 47:3 49:11 52:18 53:16 58:11

**before** 7:23 12:4 15:3,9 19:15 42:12 47:23 49:21 52:23

**behind** 13:24 15:22 16:2 17:23 22:7,8, 18

**being** 9:3 10:3 11:22,23 12:1 21:1 22:6 38:2 40:21 45:14 56:12 58:16

**believe** 12:24 14:14 15:18 18:20 19:6 20:19 24:2,17 25:16 27:5 28:17 34:20 35:8 37:19 40:7,12 41:1 42:17 44:4 49:6 50:20 52:9 53:7

**best** 12:6 17:25 20:18 50:1

**between** 22:22

**bit** 14:15,16 21:11 24:11 25:6 38:21 41:17

**blacktop** 48:11, 13

**blended** 9:4

**blown** 22:13

**blue** 14:24 17:4,7,15,20 18:16,17,21

**body** 38:5 39:9 40:17,19 41:19 43:15

**both** 36:9 53:24

**breaking** 30:17, 18

**breath** 39:4,5

**breathe** 41:22

**breathing** 38:22,23,25 39:1 41:24,25 42:2,3 50:6

**briefcase** 51:1

**briefly** 11:13

**bring** 42:7

**broke** 14:4,17

**broken** 27:18, 24

**brought** 51:1

**business** 9:5

**busted** 25:7

**buys** 57:4

___

**C**

**call** 8:18 12:6, 22 13:4 16:12 35:13 42:22 43:4,23 53:12, 20 54:8 55:2

**called** 10:21 14:2 42:12 44:15 56:7

**calls** 46:1 54:5, 9

**came** 12:6 14:14 16:12 18:2 20:3 27:25 53:12 54:8

**camera** 38:4

**cameras** 38:8 52:18

**can't** 14:23 23:13 32:22 41:22 45:1

**car** 11:15,22 13:24 22:6 23:8 24:22,23 28:9 30:23 31:11 41:5 46:21,22

**Carl** 6:23

**case** 56:3,4 57:8

**catch** 25:4

**cause** 12:11

**caused** 60:19



GREG DYKSMA, et al.  vs. DEPUTY TOMMY PIERSON, et al.
DEPUTY TOMMY PIERSON on 10/19/2017

DEPOSITION OF
Index: center..deputy

**center** 21:13,22

**central** 53:22

**centralized** 53:18,19

**certain** 58:15 59:5

**certainly** 51:22

**certification** 7:6

**certified** 44:8, 11 59:19,24 60:1

**chance** 60:5

**change** 36:1 37:6 55:9

**changed** 36:3, 16,17

**charges** 57:20 59:5,6,9,23

**chase** 12:7,12 30:9

**check** 42:3

**cleared** 35:8

**clergy** 9:20

**client** 9:24

**close** 8:2 14:10 18:19 53:8,11

**closest** 53:10

**Coca** 14:18

**code** 45:4,7

**codes** 45:10,12

**Columbus** 12:8 13:12 16:4

**come** 8:1 16:7 17:19 47:9 55:23

**comfort** 37:5

**coming** 12:7 16:19 53:5

**command** 24:20,21

**commander** 47:8

**commands** 24:13,14

**communicate** 31:24 32:14 34:21

**communicated** 16:15

**communicating** 22:8

**communication** 46:24

**complete** 41:7, 11

**completed** 41:19

**completely** 18:1

**compliance** 43:14

**comply** 21:19 43:21

**compressions** 48:12,18 49:5, 7,10

**con** 59:18

**concentrated** 53:16

**concern** 46:3

**CONCLUDED** 61:11

**conditions** 21:18

**confident** 14:21

**conflicts** 8:7

**confusion** 46:14 48:3

**connected** 26:9

**conscious** 38:7

**consistent** 52:6,10

**continue** 22:5

**continued** 42:3 49:25

**continuing** 41:3

**continuously** 55:6

**control** 14:22 23:13 28:15 30:3,4,16 31:11 32:8 35:2

**convicted** 59:5, 10,20 60:14

**conviction** 58:22

**copies** 59:13, 19

**copy** 50:25 51:2 59:24 60:1

**could** 21:4 23:12,14 24:11,20 26:4, 9,11 31:12,13, 16 32:16 34:18 35:17 49:24

**couldn't** 24:4,9

32:16

**counsel** 6:7

**counseling** 9:12,15

**county** 6:24 7:20,24 8:1,3 12:8,19 14:5, 12,14,15 15:8 42:22 45:8 53:14,21

**couple** 9:17 23:4

**court** 51:16 57:2,3 59:8

**Courthouse** 6:25

**CPR** 47:23 48:12,25

**crap** 59:20

**crimes** 60:14

**criminal** 56:3,4 57:19,20

**cross** 19:24 21:13

**cross-examination** 6:5

**crossing** 21:22

**cuffed** 35:7 40:24 41:2,7

**cuffing** 40:5

**curbs** 21:13

**curious** 48:15 50:21 53:13

**current** 9:2

**custody** 11:23

**cut** 13:10 22:21

_____

**D**

**dart** 43:3,6,7, 17

**darts** 42:23 44:15

**date** 10:6

**Dawson** 25:7 27:15 28:6,8, 10,12,13 40:7 41:8 42:5 53:2, 3,11,25

**days** 52:3 54:16 55:3,4,9

**dead** 50:15

**decision** 55:25 57:5

**Definitely** 30:18

**demeanor** 29:21

**department** 7:20 8:25 10:25 54:25

**deploy** 44:6

**deployed** 44:7

**deployment** 43:7

**DEPONENT** 57:21

**deposition** 6:1, 3,6,25 11:3 61:11

**deputies** 42:5

**deputy** 6:1 10:11 17:18



Case 4:17-cv-00041-CDL   Document 40   Filed 05/15/18   Page 71 of 81

GREG DYKSMA, et al. vs. DEPUTY TOMMY PIERSON, et al.          DEPOSITION OF
DEPUTY TOMMY PIERSON on 10/19/2017                      Index: describe..February

22:10 25:7
27:15 28:10,
12,13,17 35:9
40:7 41:8,9
49:8 53:14,25
55:23

**describe** 29:21
38:15

**description**
16:3

**didn't** 8:18
10:20 12:14,15
16:7 17:19,20
18:6,22,23
22:11 27:4
28:23 29:1,18,
25 31:3,4,16,
18 32:19 40:3,
10,23 46:3
47:8,9 51:4
52:10,17,20
55:5

**die** 60:20

**died** 9:25 50:17

**different** 33:3
35:24 36:12,13
38:2 52:7,19
55:7,13

**difficult** 30:1

**direction** 16:25

**disabled** 23:8

**discipline** 8:6

**discovery** 6:5

**discussion**
57:18

**dispatch** 12:7
22:9

**dispatched**

12:2

**dispatcher**
16:13,16 46:2
47:2

**dispatchers**
46:10

**distance** 14:8

**distinct** 36:12

**ditch** 23:24
25:3

**documents**
10:18 59:13

**doesn't** 8:15
21:18 43:14,17

**doing** 24:20,25
35:18 37:22
38:8,19,22
39:7 40:9 49:5,
17 50:21

**done** 7:13,14
26:11 35:17
40:15 41:15
42:12 49:12
60:3

**done-done** 7:12

**door** 24:4,9,11
27:16,21,22,25
28:11

**double-locked**
35:8

**down** 15:15,19
18:10 22:15,
17,22 26:4
29:8,11,19
30:22 33:18
34:5 35:14
37:14 39:9,10,
15,23 40:25
41:3

**drive** 22:15
25:2,6 30:23
43:12,13,20
44:7

**driver** 27:25

**driving** 21:10
22:7 30:11,14

**drugs** 30:23

**drunk** 30:23
44:24

**duly** 6:17

**during** 20:17
21:9

**Dyksma** 9:25
11:22 24:19
27:18 28:9
47:7,20 60:20

**Dyksma's** 13:2

**dynamic** 36:25
52:14

————
**E**
————

**each** 55:14

**earlier** 11:9,10

**easier** 48:18

**east** 53:21,25

**easy** 53:20
60:2

**effort** 34:21

**either** 38:11
42:5 48:21

**electricity**
43:16

**else** 29:14
39:13 40:5
49:24

**else's** 51:7

**eluding** 21:24,
25

**email** 51:16

**emergency**
21:17,18

**employment**
10:14

**end** 39:8

**ended** 25:8
27:22

**enforcement**
7:5,17

**enough** 26:4

**entire** 53:14
55:20

**entitled** 58:1

**evade** 19:2

**even** 33:19
49:10

**evening** 54:10

**event** 47:12

**ever** 27:25 30:4

**every** 53:14
55:4

**Everybody** 51:7

**everything** 27:1
33:21 47:15

**exact** 14:8

**exactly** 13:8
19:17 25:9
30:6 42:11
56:19 59:1

**example** 8:23

**except** 6:9 9:20

**else's** 51:7

**exhibit** 51:4,18,
21

**expressing**
46:3

**extent** 36:5

**extracted** 11:22

**extremities**
40:18

**eyes** 31:2

————
**F**
————

**face** 32:5

**faced** 33:18

**fact** 25:3

**fair** 16:18 18:6

**fairly** 53:8

**fake** 23:22

**fall** 14:20

**falling** 30:22

**familiar** 14:15

**family** 8:24 9:1,
2,4

**far** 7:5 8:6 9:3
12:11 13:1,5
14:6 19:15,23
20:9 25:5,19
28:9 32:3
35:11 38:1,11
40:1 43:9
45:12 55:8,25

**fast** 15:12
20:25 23:13
47:16

**favors** 8:21

**February** 10:12



DISCOVERY
LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations

Nationwide Coverage

1201 West Peachtree Street
Suite 2300
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

feet 25:4

felonies 59:21

felony 58:22

few 35:25 52:3

fighting 9:7

file 26:20

find 28:23 29:1 50:17 59:10

fine 31:4

fire 8:16

first 15:9,10,11 16:24 24:3,10 28:10 35:25 36:6,15 53:12 54:12 58:25

fish 44:21

five 7:18,19 20:13 26:5,6, 23,24 30:10

flat 23:1,3 48:17,19

focused 22:6 48:8

folder 51:3

follow 14:20,21 17:21

following 24:14

follows 6:18

form 6:9 36:4 57:16

forward 21:5

found 10:17 28:17 29:19 50:18,19 53:4 59:6

four 20:13 30:9 33:25 34:2 54:16 55:22

frame 19:23

frequency 16:10

friends 9:1

front 22:10,23, 24

frustration 32:10,15

fuck 24:15

full 6:21 26:7

_____

**G**
_____

gain 32:8

gaining 28:15

GBI 26:19

gets 20:22 53:14

getting 9:11,15 28:15 31:9 32:5 44:14 53:23 58:5,11

gist 56:17

give 20:11 21:7 23:22 26:10

giving 34:23

glazed 31:2

goes 7:6

going 6:9 7:14 10:22 14:13 15:12 17:10 18:12 20:24 22:12,20,23 28:1,2 33:9

38:12 41:4 49:18 52:15 57:18,22 58:9, 19 59:2 60:13

gone 13:7

good 10:2,3 21:11 22:11,14 25:5,18 49:18 53:23 60:5 61:9

got 8:13 10:17 12:22 13:4,10, 18 15:22 16:2, 12 17:23 18:3, 4 19:15 20:17 21:10,19,21,22 22:13,21,24 23:4 24:2,10 25:18 26:7,19 27:13 28:16 29:22 31:12 35:19 40:5 47:5,12,24 49:7,9,21,25 50:3 51:11,23 52:21 54:9 57:9 61:2

gotten 17:17 25:2 51:12

grabbed 33:8

greet 60:5

grew 8:10

grimacing 32:18

ground 28:15 31:7 33:13,14, 22 48:13

growl 34:15 38:23

grunting 38:23

guess 7:18 8:10 9:16 11:16 12:1,18, 21 14:19 16:9 17:4 30:15,21 31:9 32:10,15, 23 44:14 46:14 48:20 53:8 56:16 58:25

guilty 59:6 60:14

guy 24:18 28:2 49:19

guys 14:13 28:5 50:2 55:10,12,14,22

_____

**H**
_____

hadn't 57:6

half 7:21,22 55:20

Hall 20:7

hand 27:6

handcuff 31:7

handcuffed 28:16 33:23 34:6

handcuffing 33:11 35:6

handcuffs 32:9 33:19,20 35:8 40:8

hands 29:6 39:22,23,24 40:2,23

happened 10:13 16:22

19:24 21:2,8 44:20

happens 23:21

hard 48:17

Harmon 22:7, 18 24:3,10,13 25:8 27:9,10, 17 45:19 46:18 47:25 49:6 53:1,10,24 56:5 57:12

Harris 6:24 7:20 8:1,3 12:8 14:15 15:8 42:22 45:8

haven't 30:6 58:24

having 6:17 9:3

he's 21:19

head 21:6 23:22

headed 13:9 16:20

headlights 19:12

hear 31:17,18, 20 34:19 39:2 45:13

heard 34:17,18 41:21 47:3

hearing 45:15, 16

heartbeat 50:5

heavily 41:24

heavy 38:22, 23,25 39:2

held 35:9



**DISCOVERY LITIGATION SERVICES**
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

1201 West Peachtree Street
Suite 2300
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

Case 4:17-cv-00041-CDL   Document 40   Filed 05/15/18   Page 73 of 81

GREG DYKSMA, et al.  vs. DEPUTY TOMMY PIERSON, et al.
DEPUTY TOMMY PIERSON on 10/19/2017

DEPOSITION OF
Index: help..know

**help** 49:19 50:1

**helped** 60:24

**here** 8:11,19,20
9:21,22,23
10:25 20:6
55:21 57:7,22
58:21

**here's** 58:3

**highest** 20:22

**Highway** 13:9,
11

**hire** 8:15

**hit** 22:11,13,
14,25 23:24
25:18 46:19

**hold** 27:3 29:18
37:14 39:23
41:3

**holding** 34:4,5,
6 37:12 39:9,
10,15 40:25
41:16

**Holland** 13:10
18:3 19:19
20:10

**home** 8:1,2

**hook** 44:21

**hours** 50:18
54:13

**how** 7:16,19
8:13 9:5 10:10,
22 13:1 14:6
15:11 17:19
19:15 20:9
23:3,4 25:5
28:24 29:21
30:24 38:14
39:10 45:3

47:14 49:16
50:8 54:12,23
61:7

**hundred** 49:15

—————————

**I**

**I'd** 32:24 37:15

**I'm** 7:13 14:19
20:15 21:10
25:20 27:8
30:15,21 31:9
32:25 37:5
44:14 45:9
48:14 53:13
56:16,19
57:22,25
58:11,12 59:18
61:8,9

**I've** 8:20 9:17
33:7 44:7 52:3

**ID** 34:22

**idea** 12:18
15:25 28:1
50:7

**identified** 17:24

**immediately**
24:4

**immobilized**
25:23

**impaired** 29:23
31:10

**impeachment**
60:7

**impression**
21:8

**incapacitation**
26:6

**incident** 9:24

10:2 11:5 12:2
39:20 44:12
50:23 51:6,18,
20

**incoherently**
31:21

**indicating**
35:21 58:10

**influence** 29:25
30:25

**information**
16:5

**injured** 43:25
44:2

**inmate** 7:2

**inside** 25:11,16
27:19

**instead** 48:13

**intersection**
18:3 20:2

**into** 9:13 14:14
23:23,24,25

**involuntarily**
23:9

**involved** 40:1

**involving** 9:24

**isn't** 51:9

**it's** 8:2 9:5,10
11:18 18:6
19:8 20:6,20,
22 23:15,17
26:8 35:24
43:14 44:21
48:18 51:10,
12,21,23
53:13,17,18,
20,22 60:2

**itself** 39:1

—————————

**J**

**job** 8:13 35:17

**joined** 13:25

**joining** 13:5

**Jolley** 8:11

**jolt** 26:10

**JONES** 6:3,14,
20 26:17,21,
23,25 36:8,11
50:25 51:12,
14,20,25 52:1
57:23 59:14,17
60:1,4,12 61:2,
4,7

**jury** 59:4

**just** 8:17 9:1,24
10:13 11:19,20
12:15 14:20
17:21 20:1,3,
11 21:4,7 23:7
24:24 26:3
27:6 30:17,24
31:2,21 32:4,9
33:1,2,8 34:9,
14 35:1,13,14,
16 36:24 37:5,
10 38:4 39:1,4,
5,15,19 40:13,
19,20 41:4,13,
16 43:3,13,16
44:9 45:8,12
47:17 48:14
49:11,17 50:21
51:15,17 53:5,
7,13 54:4,7
55:12,25 56:21
60:8

—————————

**K**

**keep** 33:2
35:16 40:13,
16,18,20 49:18

**keeping** 39:24

**kept** 33:9 49:17

**kick** 23:10
33:20

**kicking** 33:24

**kids** 9:3,4

**kill** 60:24

**killed** 60:22

**kind** 14:20
21:4,7 22:21
24:6,15 31:2,
24 32:6 33:1,
11,23 34:15
35:13 36:16
37:24 39:3,19
44:21 46:14
47:17,22 53:16
56:25

**knee** 34:24
35:1,12,24
36:15,17
37:13,15 38:3,
15 39:10,12,
16,23

**knees** 37:6

**knew** 12:15
16:18 47:18
55:14 56:15

**knife** 28:19,22,
24,25 29:2,4

**know** 8:5,6,11,
22 9:21,22,25
10:7,16 11:17,



**DISCOVERY LITIGATION SERVICES**
Court Reporting • Videography • Trial Presentations

Nationwide Coverage

1201 West Peachtree Street
Suite 2300
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

GREG DYKSMA, et al.  vs. DEPUTY TOMMY PIERSON, et al.
DEPUTY TOMMY PIERSON on 10/19/2017

DEPOSITION OF
Index: knowing..most

23 12:3,10,12, 14,15 13:3 14:8 15:16 16:15 17:12,17 19:17 20:1,13 21:2,3,7,19 22:2,12,14 23:3,4 24:22 25:5,9,14,17, 19 26:8,12,13, 14,16 27:3,10, 12,14,21,24 28:4 29:1,19, 25 30:22,23,24 31:4,10,16,21 32:6,9,16,24 33:23 34:11 36:2,3,17,23 37:2,4,6,9,21 38:1 39:11 40:3 41:15 42:4,10 43:9, 10,23 45:8,11, 19,24 46:3,13, 18,23 47:10, 14,15 48:2,5 49:3,16,18 50:2,3,11,13, 14,25 51:3 52:13,18,19 53:6,22 54:9, 18 56:12 57:5, 24 58:5,13 59:1,4,15,22 60:3,6 61:5,7,8

**knowing** 14:12

**knowledge** 20:18

**known** 8:20

———

**L**

**Lake** 14:18

**last** 10:14 11:7 51:3

**Late** 10:8

**later** 9:23 46:6, 10 47:1 50:18

**law** 6:6 7:5,16 30:17,18

**lawyer** 57:7

**lead** 13:21 22:6

**least** 23:4 34:3

**leave** 7:25 8:8 43:17

**left** 8:5 50:15

**leg** 37:10,13

**legs** 33:21,24

**less** 54:21

**let** 10:4 42:21 56:21 57:11,24 58:21

**let's** 16:23 48:16

**lift** 41:19

**light** 17:5,16,20 18:21

**lights** 14:25 17:7 18:5,17 19:20

**like** 8:7,18 15:15 19:24 20:6 21:9 22:22 24:17,21 29:22 30:4,5, 22,25 31:21 32:5,10,11,17 34:9,10,15 35:23,25 39:2, 4 40:20 41:21,

**last** 22 43:17 44:21 45:9,11 47:1, 15 49:14 52:5, 13,17,21 54:15,18 57:13

**likely** 60:5

**limit** 18:18 21:19

**line** 12:19 14:5, 12 21:13,23

**little** 14:14,16 19:9 24:10 36:6 38:21,24 41:17 54:7

**live** 8:3

**load** 50:9

**locked** 27:21

**logs** 26:17

**long** 7:16 10:10 38:14 47:14 50:8 54:12,23

**longer** 36:2,6 42:2

**look** 11:4,14,19 15:15 29:22 50:12 52:10 57:2

**looked** 10:18 11:6,15 22:19, 20 30:25 32:17 52:2,3,4

**looking** 9:13 27:12 56:20

**looks** 35:23

**lot** 45:8 50:9, 12 51:11 52:14

**lower** 20:23 39:12 40:18

**lurching** 33:11, 12

———

**M**

**made** 8:8 34:21 38:24 57:6 58:16

**madman** 34:10

**maintain** 37:8

**make** 17:24 18:6 33:4 37:10 43:21 51:4

**making** 31:20 34:14 38:20,21 39:1

**many** 23:3,5 49:16

**marker** 19:24 20:1

**marks** 51:12

**married** 9:3,4

**matters** 11:16

**may** 17:25 34:11 36:8 37:3 49:6 54:1

**maybe** 10:18 20:13 30:1 31:21 32:20 53:9 57:5 59:23

**mean** 8:21 9:23 17:19 20:10 21:12 25:21 26:9 29:22 30:8,9 32:23 36:24 37:5 39:1,22 48:23

**lurching** 53:13,15 56:6, 15 58:24 59:12,22

**medical** 44:18

**member** 8:24 9:1

**memory** 10:2 12:6 17:25

**might** 40:3 47:2 58:25

**mile** 14:10 19:24 20:1

**miles** 13:3 19:17 20:13 30:10

**mind** 51:15

**minutes** 46:14 53:9

**mischaracterize s** 36:5

**misdemeanors** 59:21

**mode** 43:3,5,6, 7,11

**mom** 45:1

**moments** 52:20

**month** 10:7

**months** 10:14, 15

**more** 11:19 14:9 32:10 35:19 38:4 53:17,18,19 54:21 60:10

**morning** 19:5

**most** 37:9 52:9 53:15



GREG DYKSMA, et al.  vs. DEPUTY TOMMY PIERSON, et al.
DEPUTY TOMMY PIERSON on 10/19/2017

DEPOSITION OF
Index: motor..out

motor 31:4

move 23:12,14 25:4 29:17 35:14 48:11 57:25

moved 25:5 37:3

movement 38:1

moving 40:14, 18 41:14

Mr 6:3,12,14, 20,21 10:21 11:22 26:17, 19,21,22,23, 24,25 36:4,8,9, 11 47:7,20 50:25 51:10, 12,13,14,17, 20,22,25 52:1 57:16,23 59:12,14,15, 17,24 60:1,2,4, 11,12 61:2,3,4, 6,7,9

much 7:19 14:16 49:19

multiple 59:23

Muscogee 7:24,25 8:5 14:2 16:4 22:1

myself 41:8

___ N ___

name 6:21 34:22 51:23

natural 39:20

naturally 29:8 45:23

near 23:13

neck 34:25 37:18

need 12:20,21 40:2,3 44:18 45:5 61:4

needed 44:16 46:4,12,16 56:1

needs 59:15

never 10:22 15:4,5 34:21 41:21 44:4,6,7

new 55:24

next 18:2 23:21

Nicholas 9:24 60:20

night 54:6 55:1

nights 55:3,4,9

nobody 9:17 16:4 50:16

noise 34:14,17 38:20 39:1,3

noises 31:20, 23,24 38:24

non-responsive 42:4

none 9:5

noninvasive 43:14

nonsense 31:22

north 13:19 20:2 54:1

northsouth 53:22

nothing 31:23 45:11

notice 6:8 38:20

noticed 42:1,5 47:19

now 9:6,23 20:4 21:13,22 23:15 32:3,24 42:21

number 16:1,2

nurse 44:25

___ O ___

o'clock 19:4

O.J. 18:25 19:3

oath 6:17

Object 36:4 57:16

objections 6:8

objective 35:15

obviously 44:1 51:24 56:9

occurred 10:5

October 6:2

off 14:2,4,17 22:21 23:15 24:2 25:2,6 29:20 37:9,24 41:18 49:15 55:17

Offender 58:25

Office 7:24 50:20

officers 18:14 22:9 33:25

34:2 37:21 39:7,10 46:2,7 48:10 49:2 56:2 58:4

Oh 7:25 27:23 43:7 48:22 51:12 52:17,21

okay 6:14,24 7:2,16,19 8:4, 10,17,23 9:5,9, 19,21 10:4,10, 13,24 11:2,7, 12,14,21 12:10,18 13:21 14:17,19 15:11,24 16:18 17:2,14 18:6,9 19:8,22 20:3, 14,20,24 21:25 22:4,6 23:10, 19 24:12 25:15 26:17 27:6,10 28:5,8 29:2 30:1 32:1,12, 20 34:3,8,17, 24 35:18,23 36:23 37:20 38:14 39:15 41:2,10 42:1, 18 43:2 44:14 45:5,13 46:1 47:12,18 48:9 49:2,14 50:2,8, 17 52:23 54:3, 9,12,18 55:5, 10 56:6,25 57:11 58:21 61:1,3

once 16:22 22:12 26:14 27:17 28:1 31:12 35:7 41:2,7,11

one 11:18,19, 20 15:9,10 18:2 19:4 24:3 25:1 26:21,22, 24 27:14 33:25 36:1,19,23 37:10 38:3 40:7 42:4,5,11 44:1,9 45:20, 21,23,25 46:10,15 47:10,15 48:10 51:10 55:6 57:4

only 21:21 26:5

Onto 35:20

open 19:8 24:9, 11 27:16

opened 27:22 28:10,11

opening 27:22

operate 21:17

opposed 17:21 39:23 41:3

opposite 16:24

other 6:6 12:2 13:24 15:7,8 22:8 28:3,6 36:19,24 37:3, 10,13,21 38:4 39:7,10,24 46:2 48:10 54:9 55:15 58:4 59:6

our 50:1 55:24

out 10:17 12:8 13:14 18:25 24:3,4,10,11, 15 25:2,7,13, 21,22 26:1



DISCOVERY LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

1201 West Peachtree Street
Suite 2300
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

Case 4:17-cv-00041-CDL   Document 40   Filed 05/15/18   Page 76 of 81

GREG DYKSMA, et al.  vs. DEPUTY TOMMY PIERSON, et al.                    DEPOSITION OF
DEPUTY TOMMY PIERSON on 10/19/2017                                      Index: over..realized

28:12 29:13,22
30:4 31:6 33:9
39:4,5 44:21
50:1,17,18,19
52:17,24 53:4,
12 54:8,18
59:10

**over** 11:9 12:24
13:10 20:19
21:10 22:23
23:24,25 26:7
31:3 32:25
33:10 35:19
40:22 46:18
47:3 49:8 52:3
53:25

_____

**P**

**p.m.** 54:14

**pack** 42:6

**pages** 51:8

**pain** 32:17,19
43:14

**papers** 10:17,
20,23

**paramedics**
50:3,8

**part** 37:18 52:9

**particular** 45:4

**passed** 13:19

**passenger**
27:16

**pat** 29:19

**patrol** 41:5
53:5,7,15

**patrolling** 54:7

**patted** 29:8,11

**paved** 21:1

**paving** 20:3

**people** 8:20
9:17 14:2 33:3,
4,7 55:9,23
58:15

**Perhaps** 32:22

**period** 36:2

**permanently**
59:2

**person** 41:11
43:24

**personality** 8:6

**personally**
40:10

**pick** 12:19
14:13 15:22

**picked** 14:6
15:4,24 19:18

**Pierson** 6:1,4,
16,21,23 57:21

**pin** 35:14

**pinned** 24:4

**pirate** 34:15

**placed** 11:23

**plain** 45:8,12

**Plaintiff** 6:4

**plead** 57:18

**please** 6:15

**plus** 21:25

**pocket** 28:19,
22,25

**point** 10:16
15:2,3,14,18,
24 18:10,11,12

21:5,8 23:1,15,
18 25:2,9,25
27:18 33:15,
22,25 35:3
36:1 37:22
38:19 40:2,24
41:3,13 42:1,4
45:24 48:4,10
49:21 50:4
59:4

**police** 12:7,12

**popped** 33:8

**populous** 53:17

**position** 13:15
35:10 36:1,3
38:5

**positioned** 39:8

**positions**
36:13,16,18
38:2

**precautions**
30:13

**preparation**
11:3

**presently** 7:2

**pressure** 40:17
41:17

**pressure-hold**
35:13

**pretty** 14:10
36:9 47:13
49:19 53:15

**Prior** 16:3

**probably** 14:9
20:20 26:3
32:24,25

**problem** 60:11

**problems** 8:5

**procedure**
42:22

**process** 29:13

**prongs** 33:8
43:1

**prosecution**
56:23,24 57:1

**pull** 37:11

**pulled** 22:17,23
25:13,21,22
26:1 29:20

**pulling** 28:12
37:11

**pulse** 42:3

**purpose** 44:5
45:6

**purposes** 6:5,6

**pursuant** 6:7

**pursued** 19:15

**pursuing** 12:12
15:6 17:15
30:3

**pursuit** 12:16
13:22 14:3
15:4 16:19
18:25 19:3
20:17 21:9
53:4

**push** 33:21
37:15,16

**pushing** 41:18

**put** 8:17,19
10:4 18:10
28:24 31:6
34:24 35:11,
12,24 36:16

40:8 41:4
42:23 43:15
51:17 56:21

**putting** 37:13
40:17

_____

**Q**

**question** 6:9
30:2 58:1,3

**questions** 56:7
57:10 59:16
60:10

**quick** 32:25
47:13 50:9
53:15

**quicker** 48:1

_____

**R**

**radar** 54:3

**radio** 16:9
45:4,13,15,17
46:1,19,23
47:4 48:6,7

**radioed** 16:5

**radioing** 22:8
46:2

**rambling** 31:21

**rammed** 23:23
46:20,22

**reach** 28:2

**reaction** 32:4

**reactions** 33:3

**real** 32:25

**realize** 52:17

**realized** 23:2



GREG DYKSMA, et al.  vs. DEPUTY TOMMY PIERSON, et al.                    DEPOSITION OF
DEPUTY TOMMY PIERSON on 10/19/2017                              Index: really..sentenced

**really** 47:16
59:16

**rearrange** 56:1

**reason** 51:2

**reasons** 8:5

**recall** 12:11
15:13 18:20
19:9 39:14
45:7 52:22

**receive** 10:20

**received** 10:23

**recently** 21:3
52:2

**record** 6:22

**records** 16:17
42:20 50:12

**reference** 19:23

**regular** 9:18

**relative** 10:3

**relevance**
57:17

**remember** 10:5
11:15,25 12:1,
5,23 16:6,8
19:22,23 21:5,
6 22:13,19
27:2 30:6
42:11 45:15,16
46:1 47:10,11
48:7 52:7
54:11 57:12
59:23

**remove** 43:1

**removed** 44:16

**removing** 28:9
45:6

**report** 43:22
51:1,2,4,6,18,
20 52:2,5,10,
18

**reporter** 51:16

**reports** 50:22,
23

**request** 44:1

**requested**
45:14 46:11
47:25

**requesting**
45:18

**require** 45:17

**reserve** 6:13

**reserved** 6:8

**resist** 31:11

**resisting** 26:2
41:14

**respond** 12:9

**responding**
17:6 24:19

**response** 24:21

**responsibility**
46:23

**responsiveness**
6:10

**resuscitate**
47:23

**retching** 39:3

**reviewed** 10:18

**rhythm** 49:18

**riding** 54:4

**right** 7:3 8:11
9:6,23 10:14,

16 11:25 14:18
16:14 17:15,24
18:7 19:4,19
20:4,16,24
21:14,15,20,
21,23,25 22:3
23:2,15 24:6
25:17 26:20
27:17,20,23
28:22 29:7,9,
11,14,16
30:10,12,15,19
31:6,7,8,14,15
32:3,15,24
34:1,18 36:8
37:1,15 38:19
40:6,10,14,22,
24 42:10,13
43:8,15,16,19
44:3,10,19,22
45:2,21,24
46:9,13,25
47:13,20,21
48:6 50:24
51:25 52:24
53:9 54:20,22
55:8,11,16,18
56:9 57:21
58:22 59:6

**road** 12:24
13:10 19:8,10,
19,25 20:10,
23,25 21:11
23:15,18 24:2
48:11 58:7

**rocks** 48:20

**role** 44:12

**roll** 40:22

**rolled** 35:9,19

**rooting** 61:8

**rotate** 55:3,6

**rotating** 55:12

**route** 13:6,8

**rrrrrr** 32:11
34:16

**running** 15:15
24:23 25:1
54:3

─────────

**S**

─────────

**safe** 30:11

**said** 12:7 14:4
21:9 24:17,19
30:25 32:15
37:17 38:17
41:24 42:6
46:16,18,22
47:1 48:16
52:13,21,23
57:4

**salts** 42:9,10

**same** 16:9
52:11 55:10,
12,18,22

**saw** 11:8,21
15:4,5,11,21
16:24 21:3,6
27:2,5 52:5,6

**saying** 15:2
22:5 30:16
56:16 57:12

**scene** 13:1
17:6,11 28:14
34:2 45:17
46:8 48:8
50:15 53:6

**scenery** 15:17

**schedule** 54:17

**scream** 32:24,

25 33:1,4

**screaming**
31:25 32:3
33:2 34:8,9,10,
11

**search** 34:7
40:10,15 41:7,
11

**searched** 28:16
29:11 41:6

**searching** 35:6

**seat** 41:4

**second** 26:5
27:3 36:7

**seconds** 26:6,
23,24 35:25

**see** 14:24 15:7
16:23 20:11
24:20 27:4
29:10 31:3,4
39:12 60:8

**seeing** 19:10

**seem** 44:2 52:5
57:13

**seemed** 31:15,
23 39:19
47:15,16

**seems** 43:24

**seen** 19:11
30:6 33:7
49:11

**sense** 49:22

**senses** 42:7

**sent** 10:24

**sentence** 59:11

**sentenced**
58:24 59:9



**DISCOVERY**
**LITIGATION SERVICES**
Court Reporting • Videography • Trial Presentations

Nationwide Coverage

1201 West Peachtree Street
Suite 2300
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

GREG DYKSMA, et al.  vs. DEPUTY TOMMY PIERSON, et al.
DEPUTY TOMMY PIERSON on 10/19/2017

DEPOSITION OF
Index: September..Sturdevant

**September** 10:8

**sergeant** 18:1
22:7,18 24:2,
10,13 25:8
27:8 45:19
46:18 47:25
49:6 53:10,24
56:5

**set** 22:9

**seven** 10:15

**several** 13:3
19:17 25:4
46:14 50:18

**sheriff** 8:11
10:11

**Sheriff's** 7:20,
24 50:20

**shift** 41:16 46:7
52:24 54:13,
23,24 55:1,6,8,
10,18,24 56:1
58:4

**shifts** 55:7

**short** 36:10

**shot** 53:23

**should** 56:4

**shoulder** 48:23

**show** 38:11,12

**showed** 11:22

**shown** 36:14

**shows** 36:5
38:17

**side** 21:11
27:14,16,25
28:6 35:9
36:19,23 37:3
53:21,25

**Side-by-side**
24:7,8

**signal** 45:4

**signature** 6:13

**simple** 56:21

**sir** 7:1,4,10,15
8:9,12,15 9:1
10:1 11:6,11,
24 12:17
13:13,17,23
14:1,4 15:20,
23 16:11,17,21
17:1,3,9 18:11,
15,23 23:16
28:7 31:23
35:22 37:23,25
38:6,13 39:21
40:12,19 41:23
42:24 44:13
45:7,22 49:1,
13 52:3,25
55:19 56:10
58:20 59:3
60:21,23,25

**siren** 17:16

**sit** 40:21,22
58:21

**sitting** 24:25

**situation** 9:2,6
36:25 45:11
47:17 52:14

**situations**
58:14

**six** 10:14,15

**skills** 31:4

**sloped** 48:24

**slow** 19:3
47:16

**slowed** 15:15,
18,19 22:15
26:3

**slowing** 22:17,
22

**smelling** 42:9,
10

**soft** 48:13

**sole** 45:6 51:2

**some** 8:20 9:13
10:16,17,18
11:6 15:2,3
20:23 25:9
33:4 34:14
35:3,19 37:22
38:19,24 41:13
42:1 45:10,24
46:13 48:3,10
49:21 50:11
54:15,16,19,21
60:6,7

**somebody** 27:3
34:9 37:2 40:5
42:23 43:3,20
53:5 55:17
57:4

**something** 7:12
10:9 24:17
29:25 31:1,13,
15 39:16,19
42:6,19 55:17

**somewhere**
13:15 53:23

**soon** 26:6

**sound** 33:5
38:23

**sounded** 32:10
39:4

**south** 13:11,12

**speak** 14:23
32:22 57:22

**speaking** 31:22

**special** 8:21

**specific** 45:7,
12

**specifically**
18:20

**speculate**
36:14 38:18

**speed** 16:23
18:18 20:17
21:19

**speeding** 21:22

**speeds** 21:10

**spend** 50:9

**spending** 58:5

**spent** 50:11

**spoke** 56:5,6

**Springs** 12:24

**stand** 57:12,14

**standard** 42:22

**start** 17:14
24:21 26:8
48:12

**started** 15:22
19:14 28:2
49:6

**status** 7:5 59:2

**stay** 55:5

**stayed** 22:18
41:9

**staying** 18:18
22:7

**steered** 23:25

**step** 48:1

**stepped** 41:12

**sticking** 48:21

**still** 7:6 9:15
13:19 15:15
22:1,15 23:12,
14,18 24:23
25:1,11 26:9
29:18 31:12,13
33:14,20,24
35:16,18 38:21
48:3

**stipulate** 51:15,
21,22

**stomach** 33:15,
16,17 35:4,7

**stop** 9:25 10:10
13:15 18:7,10,
13,22 19:16,
21,24 20:7
22:9,23 33:1
37:21 58:6

**stopped** 13:2
14:12 23:7,9
38:20 41:14
58:15

**stopping** 17:21

**strips** 18:10
19:16 22:9
23:8

**stuck** 52:16

**stuff** 12:3,4
48:20 51:11
56:25

**stun** 43:11,12,
13,20 44:7

**Sturdevant**
22:10 28:14,17
35:9 41:9 42:6



**DISCOVERY**
**LITIGATION SERVICES**
Court Reporting • Videography • Trial Presentations

*Nationwide Coverage*

GREG DYKSMA, et al.  vs. DEPUTY TOMMY PIERSON, et al.
DEPUTY TOMMY PIERSON on 10/19/2017

DEPOSITION OF
Index: subject..try

49:8 53:1,11
54:1 55:23

subject 15:25

sued 10:17

suggested
48:11

summer 10:8

supervisors
55:25

supplemental
51:7

supposed
59:10

sure 7:13 17:24
20:15 21:10
25:14,20 27:6,
8 37:11 47:6
56:19 58:2
59:22 60:3,11

surface 48:17,
19

suspended 7:7

suspension
7:11

swear 6:14

switch 49:15

sworn 6:17

———————
T
———————

T-bone 24:6

tag 16:1,2,5

take 57:25
58:8,9,19
60:17

taken 6:4,7
13:8,9

taking 6:25 9:6
30:13 44:21

Talbotton 20:6,
7

talk 45:8,12,17

talked 9:17

talking 16:23
28:20 32:4,5
36:21 45:9
46:21

tase 27:4 32:23
43:3

tased 25:12
27:3,18 34:9

Taser 25:18,24
26:3,5 32:4
33:10 42:16,23
43:22 44:4,10,
11,15 45:6,21

Tasers 33:3,8

tases 28:5

tasing 25:8

team 55:14

technique
39:15

tell 6:21 13:4
16:22 21:2,4
22:4 23:21
27:1 28:8
31:12,13
32:16,17
37:20,21 59:20
60:13

temporarily
25:23

term 46:20

testified 6:17
56:17,18,22

testify 56:2,3

than 11:19 14:9
36:7 38:4 52:7,
19

that's 6:12 9:15
18:4 19:20
21:21 27:23
36:22 41:8,12
42:19 43:2
44:20 45:4
51:8 53:14
60:7 61:2

their 14:24
19:12 42:20

there's 35:23
43:11

these 58:14

thing 21:21
24:16 32:6
34:15 36:24
37:6,7 39:3

things 9:13,14
39:25

think 10:24
14:9 19:19
23:6,7 24:9
25:25 26:1,18
27:8 36:6,22
37:18 41:8
46:19,22 51:6,
7,8 53:11,24
55:24 57:17
60:19,22

Thomas 6:4,16,
23

those 6:9 16:17
24:14 55:21
56:2 59:16

though 22:19,
20 49:10

thought 23:9
28:21 46:11
47:2

three 26:14
34:3,4 51:8
54:16,17

through 9:7
20:23

time 11:7 12:14
17:7 19:10
30:2 36:6,7,13
37:8 38:4,17
41:17 42:23
43:2 46:5,24
50:10,11 51:3
52:11 53:3
54:6,24 55:17,
24 58:5,17

times 26:15
35:24 38:3
49:15 55:13

tired 49:7,20

tires 22:11,12
23:1,12 25:4

today 6:25
11:3,10 52:5
58:22 59:9,11

together 9:8
24:6 55:15

told 10:22 18:2
19:18 45:19,24
46:10 47:2
48:1 50:16

Tommy 6:1

too 29:14
34:18

took 10:25 13:6
29:2,13 30:9
31:6 41:17

thought 23:9
28:21 46:11
47:2

47:14 49:8

top 20:17 51:8

total 38:14

touched 10:21

toward 13:12
54:1

towards 12:8
22:20

traffic 9:25
19:9 45:14,15
54:7

trained 39:16
44:10 48:14
49:11

training 48:25

transcript 57:3

transcripts 57:2

transmissions
48:7

transpired 12:4
57:19

travel 13:6

traveling 13:19

trial 56:13
57:19,22

tried 19:20
23:10 25:2,6
34:22 42:7
49:18

tries 23:21

truck 13:2 24:5
25:12,23

true 55:20

try 8:19 18:13
47:23 56:21



1201 West Peachtree Street
Suite 2300
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

GREG DYKSMA, et al.  vs. DEPUTY TOMMY PIERSON, et al.
DEPUTY TOMMY PIERSON on 10/19/2017

DEPOSITION OF
Index: trying..what's

**trying** 15:16
17:20,23 18:25
19:2,14 22:15
24:21,24 27:16
29:17,18 30:21
31:24 32:2,7,8,
13 33:18,20
35:14,16 37:11
40:16,17,20
41:18 49:19
57:13 59:18

**turn** 17:20
22:20

**turned** 13:20
15:3 17:4,14,
15 18:4,16,17,
21 19:20

**twice** 26:14

**two** 26:21
35:23 36:12,13
38:2 39:22
51:8 54:17

**type** 38:23

___

**U**

**Um-hum** 21:12
24:1 35:3,21

**unable** 30:23

**uncle** 44:25

**unconventional**
61:5

**under** 6:17
7:11 14:22
21:17 29:24
30:25

**underlying**
12:11

**understand**
8:16 21:16

30:12,15 51:14
52:12 56:19
57:9,17 59:14

**understanding**
14:11,17 25:11
29:3 44:20
50:14

**unless** 36:24
43:24 55:17
57:3

**unresponsive**
47:20 48:2,4

**until** 7:11 14:21
17:17 18:2,7,8,
16,17 40:15
41:6,15 47:1
49:9,19,25

**up** 8:3,10,18,
20 9:15 12:19
14:7,13 15:4,
22,24 17:17
18:3 19:18
21:10 22:9,17
24:10,22 25:8
27:22,25 29:17
35:9,10 37:11,
12 40:19,21,22
41:18 48:1,21

**upper** 35:1
37:17 38:15
39:8 40:17,19
41:16,19

**us** 6:21 12:9
16:22 20:11
26:2 32:14
33:12,21 34:4,
21,23 47:10

**use** 39:22
43:11 44:9
45:10

**used** 43:22
44:4 45:4,21
46:19

**useless** 49:23

**uses** 45:8

___

**V**

**vanish** 15:16

**vehicle** 13:21
15:5,11 16:3
17:24 18:7
19:10 21:17,18
22:14,16,25
23:12,23,25
24:3,15,19,23
25:1,5 27:15,
19 30:3,16

**vehicles** 15:8

**verbal** 24:13

**verify** 42:19

**very** 11:13 19:9
37:8 52:14
53:11 54:7

**VFW** 22:10

**video** 11:4,8,
15,18,19,21
12:3,4 17:10,
12 21:3,7
27:12 30:7
34:18 35:23
36:5,14 38:17
52:5,6,11

**videos** 10:19
11:4

**visible** 38:4

**voluntarily** 23:7

___

**W**

**waistband**
28:18,21,25

**wait** 13:15 18:2
60:8

**waiting** 54:4

**walked** 41:8

**walking** 31:3

**wallet** 29:13

**want** 8:8 19:6
20:11 38:18
44:24,25 45:1
49:8 51:17
53:25 55:4
57:10,15,25
60:1

**wanted** 22:1
37:6 51:4

**wanting** 38:11

**Warm** 12:24

**wasn't** 19:2
20:25 24:19
25:23 29:3,5
30:13 32:7
34:22 37:9,11
38:22 41:6,15
44:11,12 46:23
47:1,8 49:22,
24 52:16,19

**watch** 47:8

**wave** 37:24

**Waverly** 20:7

**way** 10:4 16:20
28:3 42:8,15
45:20,25
47:15,16,19
52:7 57:24

**we'll** 6:12
51:15

**We're** 9:13

**we've** 55:3

**weapon** 28:18

**weapons** 28:17
29:12 34:7

**weaving** 30:4

**weeknight** 54:6

**weeks** 54:15,
19,21 55:4

**weight** 37:9
41:17

**weird** 47:17

**well** 9:7 10:4
15:21 16:9
17:23 19:12
20:7,23 21:9
26:8 27:2
28:14 32:7,16
37:8 40:3 41:6
48:16 51:10
53:18 55:3
57:3 59:18

**went** 8:13 11:9
13:11 17:2
20:18,23 23:23
36:23 46:15

**weren't** 10:25
27:6 33:7 47:6
48:6 49:11

**west** 13:10
54:1

**westsouth**
53:21

**what's** 12:2
38:11,12



**DISCOVERY**
**LITIGATION SERVICES**
Court Reporting • Videography • Trial Presentations

Nationwide Coverage

1201West Peachtree Street
Suite 2300
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

GREG DYKSMA, et al.  vs. DEPUTY TOMMY PIERSON, et al.
DEPUTY TOMMY PIERSON on 10/19/2017

DEPOSITION OF
Index: whatever..zones

whatever  16:12 21:25 26:7,15 31:10 32:18,20 34:17 38:15 51:18 59:12

where  7:22 12:21,22 13:4,7 14:6 15:24 17:17 19:18, 20,23 22:12 24:11 26:4 31:10 35:24 39:9 46:2,15 50:19 52:20 58:14

whether  12:10 21:3,5,6 23:1 38:7 44:17 50:5,6 59:1,21 60:13

which  22:1 42:11

while  27:15 28:11 40:9 41:16 61:5

who  9:25 18:1 42:5 46:3,16 48:4 49:3,5 56:1

whoever  47:9

whole  30:2 36:24 52:23 54:24 55:8

whose  11:15, 17 27:6

why  7:25 8:5 12:12 34:24 36:3,17,23 37:3 39:22 42:25 46:13 48:13 56:15

59:15

wielding  29:3

wiggling  29:17

will  6:3,8 33:4 51:21,22 59:24 60:3,6 61:8

Williams  6:12 10:21 26:19, 22,24 36:4,9 51:10,13,17,22 57:16 59:12, 15,24 60:2,11 61:3,6,9

Winded  39:6

window  25:7 27:19,24

within  10:13 18:18 53:9

without  23:12 36:13 57:21

witness  56:7, 22 57:12,14

women  58:6,14

won't  33:4 36:14 57:3 60:7,9

wondering  33:1

word  34:12 46:19

words  12:2 31:19 32:2,7, 14

work  7:23 8:20 54:15,16,19,21

worked  54:2,23 55:15

working  10:11

49:22 50:10 53:14 55:13, 18,21

worry  40:23

would  12:4,19 13:7,8,9 14:8 17:12 19:11,15 20:16,25 29:7, 21,24 32:25 34:8 35:12 37:15 38:3,14 39:22 41:16 42:19 44:1,2, 16 45:10,23 46:15 54:8 55:6,9,18,23 58:6 60:4 61:5

wouldn't  16:15 17:10 25:4 35:14

writing  50:22, 23 51:11

wrong  21:11 34:11 52:21 58:12

———————

Y

y'all  12:18 13:2 24:6 25:22 26:4 29:7 31:6 44:16 47:18, 19,22 49:14, 23,24 53:3,4,8 55:14,18

y'all's  42:21

yeah  10:7,24 13:4,7 15:7 20:6,8 21:15 24:9,18 31:20 32:23 33:6

36:22 39:7 44:23 48:22 49:21 51:13,20 52:16 55:2 56:14 57:7 60:9,11

year  7:21,22 10:7 55:20

years  7:18,19

yelling  24:13 32:6 34:13

yet  58:24

you'd  50:12 54:15,16,19, 21,24 57:2 58:15

you're  8:21 54:3,4

you've  26:7 44:6 49:11 59:20

yourself  13:15 37:12

———————

Z

zones  20:23 54:2



1201 West Peachtree Street
Suite 2300
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com