IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF GEORGIA
COLUMBUS DIVISION

GREG DYKSMA, TAMMY DYKSMA, and    *
THE ESTATE OF NICHOLAS DYKSMA,
                                  *
    Plaintiffs,
                                  *
vs.
                                  *       CASE NO. 4:17-CV-41 (CDL)
TOMMY PIERSON, JOE HARMON,
HEATH DAWSON, WILLIAM             *
STURDEVANT, and MIKE JOLLEY,
                                  *
    Defendants.
                                  *

## O R D E R

Eighteen-year-old Nicholas Dyksma died after a Harris County sheriff's deputy, Tommy Pierson, pinned him to the pavement and used his knee to apply compression to Nicholas's neck, once for a period of twenty seconds while Nicholas was being handcuffed and searched, and later for a period of seventeen seconds after Nicholas was handcuffed, physically incapacitated, and no longer resisting. Nicholas's parents brought this action on behalf of themselves and Nicholas's estate against Pierson for his use of excessive force and against his fellow deputies, Joe Harmon, Heath Dawson, and William Sturdevant, for their failure to intervene to stop the excessive force. They assert claims against these Defendants in their individual capacities under 42 U.S.C. § 1983 for violation of the Fourth Amendment, as well as claims under Georgia law.

Plaintiffs also assert § 1983 supervisory liability claims against Harris County Sheriff Mike Jolley in his individual capacity. Defendants seek summary judgment on all of Plaintiffs' claims. Defendants assert qualified immunity as to the federal law claims and official immunity under Georgia law as to the state law claims.

The fundamental issue for Plaintiffs' § 1983 Fourth Amendment excessive force claim against Pierson is whether he violated clearly established law when he used potentially deadly force (knee to the neck) after Nicholas was handcuffed, fully restrained, and physically incapacitated. As explained in the remainder of this order, the Court finds that he did. Thus, his summary judgment motion (ECF No. 25) is denied. The Court further finds, however, that the other deputies did not violate clearly established law when they failed to intervene during Pierson's application of this clearly excessive force. Accordingly, Dawson, Harmon, and Sturdevant are entitled to qualified immunity as to Plaintiffs' § 1983 claims, and their summary judgment motion is granted as to these claims. Finally, as to Plaintiffs' supervisory liability claim against Sheriff Jolley, Plaintiffs did not point to sufficient evidence to create a genuine factual dispute on whether he participated in or had a policy that caused Pierson's excessive force. Therefore, he is also entitled to summary judgment.

The Court also denies summary judgment as to Plaintiffs'
battery and Georgia constitutional claims against Pierson but
grants summary judgment as to the rest of Plaintiffs' state law
claims. Plaintiffs' motion to amend their complaint to comport
with the facts adduced during discovery (ECF No. 30) is granted.
Pierson, the only Defendant remaining after today's rulings,
shall be permitted to have his expert on cause of death amend
his expert report in light of the amended complaint, provided
that he does so within twenty-one days of service of the amended
complaint.

SUMMARY JUDGMENT STANDARD

Summary judgment may be granted only "if the movant shows
that there is no genuine dispute as to any material fact and the
movant is entitled to judgment as a matter of law." Fed. R.
Civ. P. 56(a). In determining whether a *genuine* dispute of
*material* fact exists to defeat a motion for summary judgment,
the evidence is viewed in the light most favorable to the party
opposing summary judgment, drawing all justifiable inferences in
the opposing party's favor. *Anderson v. Liberty Lobby, Inc.*,
477 U.S. 242, 255 (1986). A fact is *material* if it is relevant
or necessary to the outcome of the suit. *Id.* at 248. A factual
dispute is *genuine* if the evidence would allow a reasonable jury
to return a verdict for the nonmoving party. *Id.*

Viewed in the light most favorable to Plaintiffs, the record reveals the following facts. The present record includes a video recording of the incident, and in determining whether there is a genuine fact dispute, the Court must view "the facts in the light depicted by the video[]" and may not adopt a version of the facts that is "utterly discredited" by the video. *Scott v. Harris*, 550 U.S. 372, 380-81 (2007).

At approximately 1:30 a.m. on August 31, 2015, police officers and emergency medical personnel responded to the Circle K on Airport Thruway in Columbus, Georgia to investigate a report of a person slumped over the wheel of a pickup truck. When they arrived, they found Nicholas Dyksma in the driver's seat of the truck. The officers and emergency medical personnel tried to check on Nicholas, but Nicholas started the truck and took off. Columbus police officers pursued Nicholas and saw him run several red lights, drive in an erratic manner and above the speed limit, veer into the wrong lane, and ignore the officers' lights and siren.[1] Because Nicholas was driving on Highway 27 toward Harris County, the Columbus police had the 911 dispatcher

---

[1] Plaintiffs do not dispute that the Columbus police report supports this statement, but Plaintiffs object to these fact statements as immaterial because Defendants were not aware of these facts or of the precise reasons why Columbus police officers pursued Nicholas. The Court considers these facts for background purposes only.

notify the Harris County Sheriff's Office that an unsafe driver failed to stop for police and was heading into Harris County.

Defendants Tommy Pierson, Joe Harmon, Heath Dawson, and William Sturdevant were on duty as patrol deputies with the Harris County Sheriff's office. They received a radio transmission from Harris County 911 that a small gray Toyota pickup truck was being pursued by Columbus police officers northbound on Highway 27, coming toward Harris County. The four deputies went to assist. Pierson saw the truck and activated his blue lights and siren. Nicholas did not stop, and he increased his speed. Nicholas swerved into the wrong lane several times during the pursuit.

Pierson continued to pursue Nicholas, followed by Harmon. Sturdevant informed the other deputies that he would deploy "stop sticks" to try to stop the gray truck. Nicholas ran over the stop sticks, and his speed decreased. Pierson got his patrol car ahead of Nicholas's truck, and he and Harmon tried to box in Nicholas. Nicholas accelerated to pass Pierson and struck the side of Pierson's patrol car; then Pierson forced Nicholas's pickup truck off the road. Pierson Decl. ¶ 11, ECF No. 25-1; Harmon Decl. ¶¶ 6-7, ECF No. 25-2; *see also* Pl.'s

Resp. to Defs.' Mot. for Summ. J. Ex. A, Dawson Dash Cam Video, ECF No. 34-3 ("Dawson Dash Cam").[2]

The truck came to rest facing north on the southbound shoulder. Harmon and Pierson stopped their patrol cars and got out. Harmon approached the driver's door and another deputy approached the passenger door. Both doors were locked, and the truck's engine was still running. Harmon commanded Nicholas to show his hands and get out of the truck. Nicholas did not get out of the truck. Dawson broke the driver's window with a baton, then Harmon deployed his Taser on Nicholas. The truck lurched forward into a ditch. Nicholas fell over onto the passenger's side of the front seat. Dawson broke the passenger window and removed Nicholas from the truck. Around that time, Sturdevant arrived at the scene.

Pierson, Sturdevant, and Dawson placed Nicholas face down on the shoulder of the road while Harmon remained on the driver's side of the truck and disconnected the wires from his

---

[2] Plaintiffs controvert this fact statement, contending that the dash cam video indicates otherwise. Dawson was driving southbound on Highway 27, and the video from his dash cam shows a pickup truck and two patrol cars coming toward him. Just before the first patrol car and the pickup truck got to the front of Dawson's car, the pickup truck passed the patrol car. Dawson Dash Cam 2:11:14-2:11:15. Both vehicles were out of the dash cam's view for a few seconds until Dawson turned his vehicle around. By that time, the pickup truck was off the road, facing north on the southbound shoulder. *Id.* at 2:11:26. This video does not contradict Defendants' evidence that the pickup truck struck the side of Pierson's patrol car and then Pierson forced the pickup truck off the road. Plaintiffs did not cite any other evidence to contradict Defendants' evidence, so there is no genuine fact dispute on this point.

Taser.  Nicholas was groaning, and it appeared to the deputies that he was high on something.  Dawson handcuffed Nicholas and began to search his pockets, and Sturdevant physically restrained Nicholas's lower body.  Nicholas was breathing heavily.  Pierson physically restrained Nicholas's upper body by placing his right knee on Nicholas's neck for approximately twenty seconds.[3]  Dawson Dash Cam 2:12:46-2:13:07.  Nicholas initially screamed, then groaned for a few seconds.  As Pierson got up, Nicholas was no longer groaning audibly.  By that point, Nicholas's hands were cuffed behind his back, and he was no longer struggling or otherwise resisting.  Dawson returned to the driver's side of the truck, and Harmon went over to where Sturdevant and Pierson were restraining Nicholas.  Pierson moved to Nicholas's other side, and he and Sturdevant turned Nicholas over to search his waistband.  Nicholas did not struggle or resist.  His body appeared to be limp, and he was clearly incapacitated.  Pierson and Sturdevant placed Nicholas back in a prone position, and Pierson again placed his knee on Nicholas's neck, pressing it to the ground for another seventeen seconds.  *Id.* at 2:13:16-33.  Nicholas did not struggle or resist.  He did lift his head when Pierson briefly relieved the pressure on his

---

[3] Pierson contends that he placed his knee on top of Nicholas's "upper back, near the lower neck area."  Pierson Decl. ¶ 20.  Based on the video, Pierson's knee was on Nicholas's neck for at least part of the time, although the exact placement of Pierson's knee is obscured for several seconds.  Dawson Dash Cam 2:12:46-2:13:07.

neck, but he did not appear to move otherwise.  Harmon observed for the first few seconds and then returned to Nicholas's truck. Sturdevant resumed restraining Nicholas's lower body by placing his knee on Nicholas's buttocks and his hand on Nicholas's back; then Pierson stood.  Sturdevant and Pierson both stated that Nicholas was making sounds during this time and was not having trouble breathing.  Pierson Decl. ¶ 25; Sturdevant Decl. ¶¶ 9-10, ECF No. 25-4.[4]  Sturdevant kept his hand on Nicholas's back for several more seconds.  A deputy called for emergency medical personnel.

The deputies soon realized that Nicholas had become unresponsive.  Dawson went back to assist Sturdevant and noticed that Nicholas was unconscious and that his breathing was shallow.  Dawson suggested that Nicholas be turned onto his side.  The deputies turned Nicholas onto his side and said, "Hey Nicholas! Open your eyes, Nick!" Dawson Dash Cam 2:15:47-53.  A deputy asked if Nicholas was still alive, and the response was, "Carotid's going.  Going quick."  *Id.* at 2:15:57-2:16:04.  The deputies continued telling Nicholas to wake up.  A deputy said, "Come on, breathe!  You got it!  Breathe!"  Then a deputy said, "He just took a breath."  A deputy placed his hand on Nicholas's

---

[4] Plaintiffs controvert this fact statement because "at some point" the breathing and sounds stopped.  Plaintiffs did not point to a specific point on the video when they contend it is obvious that Nicholas stopped breathing.  Based on the Court's review, Nicholas was still moving his head for a while after Pierson got up the second time. Dawson Dash Cam 2:13:33-2:15:10.

neck, apparently feeling for a pulse. Someone said, "Looks like he's got some kind of arrhythmia going." *Id.* at 2:16:58-2:17:15. The deputies asked the emergency medical personnel to speed up their response. *Id.* at 2:17:34-44.

At 2:20 a.m., a deputy asked if Nicholas was still breathing. *Id.* at 2:20:09-11. Two deputies examined him and could not find a pulse, and a deputy radioed for an estimated time of arrival for emergency medical personnel, explaining that they could not find Nicholas's pulse. *Id.* at 2:20:23-42. One deputy asked if they should start doing compressions and asked another deputy if he could feel a pulse; both of them stated that they could feel a faint pulse. *Id.* at 2:21:03-09. A deputy asked twice if Nicholas was still breathing. The deputies concluded that Nicholas was not breathing, and they uncuffed him and moved him to a flat area and began chest compressions. *Id.* at 2:22:09-2:23:53. Harris County emergency medical personnel arrived several minutes later and transferred Nicholas to Midtown Medical Center, but he could not be revived.

Shortly after Nicholas's death, Defendant Mike Jolley, the Harris County Sheriff, reviewed the dash cam video of the incident. He concluded that the deputies' actions, including Pierson's use of his knee to restrain Nicholas, were consistent with the Harris County Sheriff's Office use of force policy. That policy permits non-deadly force "[w]hen making lawful

arrests and searches, overcoming resistance to arrests or searches, and preventing escapes from custody." Defs.' Mot. for Summ. J. Ex. F, Harris Cty. Use of Force Policy § VII, ECF No. 25-6. The policy further states that "[w]hen use of force is justified it is necessary to use only that amount of force necessary to overcome the resistance that is being used against the [deputy]." *Id.* The policy also permits deadly force under circumstances that undisputedly do not apply here.

Dr. Natasha Grandhi, a Georgia Bureau of Investigation pathologist, performed an autopsy of Nicholas's body and prepared a report. That report lists four pathological diagnoses: (1) prone position and compression of the neck and torso; (2) deployment of the barbs of an electroconductive device; (3) acute methamphetamine intoxication; and (4) a heart defect called myocardial bridging. Dr. Grandhi opined that each of these diagnoses may have contributed to Nicholas's death, but she could not state to a reasonable degree of medical certainty that any one of them alone was the cause of death. Dr. Grandhi concluded that Nicholas's death was a homicide. Under "cause of death," Dr. Grandhi stated, "Sudden death during an altercation with law enforcement, after deployment of an electroconductive device, with prone positioning, compression of the neck and torso, and acute methamphetamine intoxication." Defs.' Mot. for Summ. J. Ex. I, Autopsy Report 5 (Dec. 11, 2015), ECF No. 25-7.

Plaintiffs' medical expert, Dr. Kris Sperry, opined that the pressure to Nicholas's neck interfered with the functioning of his vagus nerve and "[p]recipitated a cardiac arrhythmia." Sperry Dep. 31:18-22, ECF No. 28. Defendants' experts dispute Dr. Sperry's opinions, creating a genuine factual dispute as to the proximate cause of Nicolas's death. They attribute Nicholas's death to methamphetamine toxicity and his heart defect.[5]

DISCUSSION

## I. Plaintiffs' § 1983 Claims

### A. Qualified Immunity in the Excessive Force Context

Defendants assert that they are entitled to qualified immunity on Plaintiffs' § 1983 claims. "Qualified immunity is total immunity from suit[.]" *Manners v. Cannella*, 891 F.3d 959, 967 (11th Cir. 2018). This "immunity allows government officials to 'carry out their discretionary duties without the fear of personal liability or harassing litigation.'" *Id.* (quoting *Oliver v. Fiorino*, 586 F.3d 898, 904 (11th Cir. 2009)). To be entitled to qualified immunity, the officers first "must establish that they were acting within their discretionary

---

[5] Plaintiffs' expert acknowledges that the neck compression did not cause asphyxia, which was the cause of death alleged in Plaintiffs' original complaint. But because the Court grants Plaintiffs' motion to amend their complaint to clarify that the cause of death was cardiac arrhythmia due to interference with the vagus nerve from the neck compression, the Court finds Defendants' motion for summary judgment based on causation and asphyxia moot.

authority during the incident." *Id.* Here, there is no dispute that the deputies and Sheriff Jolley acted within their discretionary authority. The remaining question is whether Plaintiffs have established that qualified immunity is not appropriate based on the facts in this case. *Id.* at 968.

"The qualified immunity inquiry articulated by the Supreme Court provides immunity for law enforcement officers 'unless (1) they violated a federal statutory or constitutional right, and (2) the unlawfulness of their conduct was "clearly established at the time."'" *Id.* (quoting *District of Columbia v. Wesby*, 138 S. Ct. 577, 589 (2018)). "These two components may be analyzed in any order." *Id.* "Qualified immunity attaches when an official's conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Kisela v. Hughes*, 138 S. Ct. 1148, 1152 (2018) (per curiam) (quoting *White v. Pauly*, 137 S. Ct. 548, 551 (2017) (per curiam)). It "protects all but the plainly incompetent or those who knowingly violate the law." *Id.* (quoting *Pauly*, 137 S. Ct. at 551).

"The Fourth Amendment's freedom from unreasonable searches and seizures encompasses the plain right to be free from the use of excessive force in the course of an arrest." *Lee v. Ferraro*, 284 F.3d 1188, 1197 (11th Cir. 2002). Claims for excessive force in the course of an arrest are properly analyzed under the

Fourth Amendment's "objective reasonableness" standard. *Graham v. Connor*, 490 U.S. 386, 395 (1989). The Supreme Court has long recognized that "the right to make an arrest or investigatory stop necessarily carries with it the right to use some degree of physical coercion or threat thereof to effect it." *Id.* at 396. So, in determining whether the force used during an arrest is reasonable, the Court generally considers "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Id.*; *accord Lee v. Ferraro*, 284 F.3d 1188, 1198 (11th Cir. 2002) ("*Graham* dictates unambiguously that the force used by a police officer in carrying out an arrest must be reasonably proportionate to the need for that force, which is measured by the severity of the crime, the danger to the officer, and the risk of flight."). The Court must also "examine (1) the need for the application of force, (2) the relationship between the need and amount of force used, and (3) the extent of the injury inflicted." *Id.*

"Use of excessive force is an area of the law 'in which the result depends very much on the facts of each case,' and thus police officers are entitled to qualified immunity unless existing precedent 'squarely governs' the specific facts at issue." *Kisela*, 138 S. Ct. at 1153 (quoting *Mullenix v. Luna*,

136 S. Ct. 305, 309 (2015)). In the Eleventh Circuit, the relevant precedent consists of cases decided by the United States Supreme Court, the Eleventh Circuit, or the Georgia Supreme Court. *Leslie v. Hancock Cty. Bd. of Educ.*, 720 F.3d 1338, 1345 (11th Cir. 2013). Although Plaintiff argues otherwise, the Court cannot rely on out-of-circuit cases to determine whether it would be clear to a reasonable officer in Georgia that his conduct was unlawful in the situation he confronted.

    B.    Is Pierson Entitled to Qualified Immunity?

Plaintiffs do not argue that the Harris County deputies were wrong to pursue and stop Nicholas based on the Columbus officers' report of an unsafe driver and their own observations of his driving. Plaintiffs also do not challenge the breaking of the truck windows, the use of the taser, the forcible removal of Nicholas from the truck, or the placement of Nicholas on the ground for handcuffing and a safety check. And they do not dispute that some degree of force was permissible to restrain Nicholas while the deputies handcuffed him and performed a safety check. The only use of force Plaintiffs challenge in this case is the neck compressions by Pierson. Plaintiffs contend that a reasonable officer in Pierson's situation would have known that the force was excessive under the circumstances.

It is not clear that all of the neck compressions applied to Nicholas constituted excessive force under clearly established law. The video shows that the first twenty seconds of neck compressions were done while the deputies were trying to handcuff Nicholas and conduct a safety check. The Court cannot conclude that every objectively reasonable law enforcement officer would find this use of force to be unlawful. A reasonable argument can be made that it was necessary to secure and restrain Nicholas under the circumstances. But when Pierson stood up after those twenty seconds, Nicholas was clearly handcuffed, restrained, and incapacitated. After that break, Pierson made the conscious decision to jam his knee back onto Nicholas's neck—an act that was unnecessary since Nicholas was clearly handcuffed, restrained, and incapacitated.

By August 2015, it had long been clearly established that after a suspect is arrested, handcuffed, and completely secured, and after the risks of danger and flight have passed, significant force that is "wholly unnecessary to any legitimate law enforcement purpose" is excessive. *Lee*, 284 F.3d at 1198; *accord Saunders v. Duke*, 766 F.3d 1262, 1265 (11th Cir. 2014) ("We have repeatedly ruled that a police officer violates the Fourth Amendment, and is denied qualified immunity, if he or she uses gratuitous and excessive force against a suspect who is under control, not resisting, and obeying commands.").

The following cases clearly establish this principle:

*Saunders v. Duke*, 766 F.3d 1262 (11th Cir. 2014): the plaintiff sold oxycodone pills to an undercover officer. After the sale was complete, officers arrested the plaintiff and told him not to move, and he "immediately complied with the command without resisting or attempting to flee." *Id.* at 1265. The officers pulled the plaintiff from a vehicle "and pushed him down on the hot pavement in order to handcuff him." *Id.* Then the officers held him down against the hot pavement even though he was not resisting, posing a threat, or attempting to flee. The plaintiff told the officers he was getting burned, and he tried to lift his face off the pavement to keep from getting burned. One of the officers slammed the plaintiff's face onto the pavement, and plaintiff started bleeding. The Eleventh Circuit concluded that the "force was unnecessary, disproportionate, and constitutionally excessive." *Id.* at 1268.

*Hadley v. Gutierrez*, 526 F.3d 1324 (11th Cir. 2008): the plaintiff was high on cocaine when he entered a supermarket and created a disturbance. He was arrested and handcuffed. As officers led the plaintiff from the store, he asked for Jehovah's protection, but he was not struggling or resisting. One of the officers punched the plaintiff in the stomach. The officer was not entitled to qualified immunity because

"gratuitous use of force when a criminal suspect is not resisting arrest constitutes excessive force." *Id.* at 1330.

*Lee v. Ferraro*, 284 F.3d 1188 (11th Cir. 2002): an officer arrested a motorist for honking her horn at a busy intersection. After she was "arrested, handcuffed, and completely secured" and "after any danger to the arresting officer as well as any risk of flight had passed," the arresting officer took the motorist to the back of her car and slammed her head against the trunk. *Id.* at 1199. This use of force after the arrest "was plainly excessive, wholly unnecessary, and, indeed, grossly disproportionate." *Id.* at 1198.

*Vinyard v. Wilson*, 311 F.3d 1340 (11th Cir. 2002): an officer arrested the plaintiff for disorderly conduct and obstruction of a law enforcement officer. He handcuffed the plaintiff behind her back and placed her in the back of his patrol car. There was a partition between the front seat and the back seat. On the way to jail, the officer called the plaintiff a "drunken, skanky whore" and told her she did not deserve her children. *Id.* at 1343. The plaintiff became upset and started screaming at the officer. The officer pulled his car over, pulled the plaintiff's head back by her hair, and sprayed her in the face with pepper spray. She remained seated in the back seat with her feet on the floorboard and her hands cuffed behind her. The use of the pepper spray was excessive

force because the plaintiff "was under arrest for offenses of minor severity, handcuffed, secured in the back of a patrol car, and posing no threat to [the officer], herself or the public." *Id.* at 1349.

*Priester v. City of Riviera Beach*, 208 F.3d 919 (11th Cir. 2000): police officers found a burglary suspect who allegedly stole $20 worth of snacks from a golf shop. They ordered him to get down on the ground and told him that if he did not do so, they would set a police dog on him. The suspect complied and "did not pose a threat of bodily harm to the officers or anyone else," but one of the officers released the dog and allowed him to attack the suspect for two minutes. *Id.* at 927. "No reasonable police officer could believe that this force was permissible given these straightforward circumstances." *Id.*; *accord Edwards v. Shanley*, 666 F.3d 1289, 1295 (11th Cir. 2012) (finding that an officer used "unconstitutionally excessive force when he permitted his dog to attack [a non-resisting suspect] for five to seven minutes").

*Slicker v. Jackson*, 215 F.3d 1225 (11th Cir. 2000): the plaintiff went to a police station to ask why a trespassing suspect had been released on bond. As the plaintiff left the police station, officers arrested him for disorderly conduct and "slammed his head against the pavement and knocked him unconscious" as they tried to handcuff him. *Id.* at 1227. When

the plaintiff came to, he was handcuffed and placed on the hood of a car; the plaintiff could not feel his arms, and he slid off the car and onto the ground. Officers continued beating and kicking the plaintiff. This use of force was excessive because the plaintiff "was handcuffed and did not resist, attempt to flee, or struggle with the officers in any way." *Id.* at 1233.

*Smith v. Mattox*, 127 F.3d 1416 (11th Cir. 1997) (per curiam): police officers were investigating an informant's tip regarding drug activity at the home of the plaintiff's mother. They found the plaintiff in his mother's front yard, and he ran away when the officers approached him. An officer eventually caught up to the plaintiff and ordered him to get down, and the plaintiff "docilely submitted." *Id.* at 1418. As the officer handcuffed the plaintiff, he placed the plaintiff's arm in a position that caused him discomfort, and the plaintiff complained. Then, "with a grunt and a blow," the officer broke the plaintiff's arm. *Id.* The Eleventh Circuit acknowledged that a reasonable officer in the circumstances could have concluded that before the plaintiff started complying with the officer's commands, the plaintiff might present some danger and that he was a potential flight risk. And the officer was entitled to use some force to handcuff the plaintiff. But if the plaintiff was "offering no resistance at all," the force

used to handcuff the plaintiff "was obviously unnecessary to restrain even a previously fractious arrestee." *Id.* at 1420.

Here, after the first twenty seconds of neck compression, Nicholas was handcuffed and was not resisting or trying to flee. He became quiet and stopped moving his legs and arms. By the time Pierson helped Sturdevant turn Nicholas over to continue the safety check, Nicholas's body appeared to be limp. When the deputies returned Nicholas to a prone position, Pierson put his knee back on Nicholas's neck and pressed it to the ground for seventeen more seconds. Pierson briefly relieved the pressure twice during that time, and Nicholas lifted his head and neck off the ground slightly but did not otherwise move. The Eleventh Circuit precedent discussed above clearly established by August 2015 that after a suspect is subdued, handcuffed, not resisting, and not a flight or safety risk, officers cannot kick him, punch him, slam his head into a car or onto hot pavement, use pepper spray on him, or use so much force to handcuff him that it breaks his arm. An obvious corollary is that an officer cannot use his knee and body weight to press to the ground the neck of an incapacitated, handcuffed, non-resisting arrestee. It should have been clear to the deputies in this case that it would be unconstitutional to use such force on Nicholas.

The Court acknowledges that it has not been pointed to any relevant precedent that is precisely on point with the facts of

this case.  No case has been located in which an officer jammed his knee onto the neck of an incapacitated arrestee for seventeen seconds.  But the law "does not require a case directly on point for a right to be clearly established[;] existing precedent must have placed the statutory or constitutional question beyond debate."  *Kisela,* 138 S. Ct. at 1152 (quoting *Pauly,* 137 S. Ct. at 551).  The Court understands that clearly established law cannot be defined at "a high level of generality."  *Plumhoff v. Rickard,* 134 S. Ct. 2012, 2023 (2014) (quoting *Ashcroft v. al-Kidd,* 563 U.S. 731, 742 (2011)).  To do so would impermissibly avoid "the crucial question whether the official acted reasonably in the particular circumstances that he or she faced."  *Id.*  To be clear, the Court today does not simply find that Pierson's use of force violated the general standard for excessive force set out in *Graham v. Connor* and its progeny.  The Court finds that on the date of Nicholas's death, it was beyond debate that a law enforcement officer who jams his knee onto the neck of a helpless and incapacitated arrestee violates that arrestee's Fourth Amendment right to be free from excessive force.

Defendants argue that the Court should consider the fact that the deputies had to forcibly stop Nicholas's truck to prevent him from endangering others, and that Nicholas initially did not follow the deputies' commands.  The Court does not

discount those facts in looking at the totality of the circumstances to determine whether the force was reasonable, but the Court also cannot ignore how the situation unfolded. Certainly, no one would dispute that law enforcement officers are required to assess the circumstances continually as they evolve. *See Mattox*, 127 F.3d at 1420 (explaining that significant force is unnecessary to restrain even a "previously fractious arrestee" after he is subdued). After significant pressure was applied to Nicholas's neck during the handcuffing process, he stopped moving and became silent and limp. When Pierson stood up following the first neck compression, he had time to look at Nicholas and see that he was incapacitated. Pierson consciously decided to press Nicholas's neck to the ground again anyway. Defendants argue that Pierson was simply restraining Nicholas and that it was reasonable for him to do so because Defendants still subjectively believed that Nicholas might try to resist or flee. But Defendants disregard how the situation actually played out: Nicholas was immobile, subdued, and largely unresponsive by the time he was handcuffed. And using a knee and body weight to press someone's neck to the ground—an act that can result in serious injury or death (and did in this case, if Plaintiffs' expert is to be believed)—is not simple restraint. The deputies acknowledge that by the time Nicholas was handcuffed and incapacitated, they were not

authorized to tase him or punch him or kick him or hit him with a baton. It was likewise unnecessary to press his neck to the ground with a knee.

Pierson argues that *Lewis v. City of West Palm Beach*, 561 F.3d 1288 (11th Cir. 2009), entitles him to qualified immunity. In *Lewis*, police officers restrained a disoriented man who kept trying to run into traffic. Once officers got the man to the ground, an officer put his knee on the man's neck and upper back for about a minute so the man could be handcuffed and put in leg restraints. The man was still breathing when officers attempted to put him in a seated position after the neck compression ended, but the man would not sit up or heed requests that he calm down. The officers decided to attach the ankle restraint to the handcuffs with a hobble cord and essentially "hogtied" the man with his hands and feet close together behind his back. The officers soon realized that the man was unconscious, and they removed the restraints and tried to resuscitate him, but he died. An expert concluded that the cause of death was asphyxia caused by neck compression.

The Eleventh Circuit in *Lewis* found the officers were entitled to qualified immunity. The Court explained that the officers' use of force was not constitutionally impermissible because the man continued to be "agitated and uncooperative," had "only a tenuous grasp on reality," did not remain

compliantly restrained, refused to sit up, and was unable to stay calm. *Id* at 1292. In arguing that *Lewis* controls, Pierson overlooks the crucial distinction between *Lewis* and the situation confronting him. Unlike the detainee in *Lewis*, Nicholas was quiet, restrained, and possibly unconscious by the time Pierson placed his knee on Nicholas's neck the second time. The video clearly shows him to be physically incapacitated and helpless. *Lewis* does not create any "haze" that makes the line between acceptable and excessive force unclear. It would be apparent to a reasonable law enforcement officer that a knee to the neck of an uncooperative resisting detainee is far different than a knee to the neck of someone who is clearly restrained, cooperative, and incapacitated. Pierson is not entitled to qualified immunity.

C.  Are the Other Deputies Entitled to Qualified Immunity?

Plaintiffs' claims against Dawson, Harmon, and Sturdevant rest on the theory that they were all in a position to intervene in Pierson's use of force but failed to do so. It is clearly established "that an officer can be liable for failing to intervene when another officer uses excessive force." *Priester*, 208 F.3d at 924. This liability "only arises when the officer is in a position to intervene and fails to do so." *Id.* at 924-25 (finding that an officer was in a position to intervene when

he watched his colleague's police dog attack a non-resisting suspect for two minutes but did nothing to stop it).

The Court has concluded that Pierson used excessive force when he jammed his knee onto Nicholas's neck the second time for approximately seventeen seconds. This application of force was administered without warning. The Court finds that given the limited duration of the force by Pierson and the unforseeability of Pierson's reapplication of his knee to Nicholas's neck, the other deputies did not violate clearly established law by failing to intervene under the specific circumstances presented to them. Accordingly, Dawson, Harmon, and Sturdevant are entitled to qualified immunity, and their motion for summary judgment is granted.

### D. Is Sheriff Jolley Entitled to Qualified Immunity?

Plaintiffs also assert a § 1983 claim against Sheriff Jolley, arguing that he should be held liable under a supervisory liability theory. "[S]upervisory officials are not liable under § 1983 for the unconstitutional acts of their subordinates on the basis of respondeat superior or vicarious liability." *Keith v. DeKalb Cty.*, 749 F.3d 1034, 1047 (11th Cir. 2014) (quoting *Cottone v. Jenne*, 326 F.3d 1352, 1360 (11th Cir. 2003)). "Instead, to hold a supervisor liable a plaintiff must show that the supervisor either directly participated in the unconstitutional conduct or that a causal connection exists

between the supervisor's actions and the alleged constitutional violation." *Id.* at 1047-48.

Here, there is no contention that Sheriff Jolley directly participated in the events giving rise to Nicholas's death. Instead, Plaintiffs assert that there is a causal connection between Sheriff Jolley's actions and the alleged constitutional violation. "The necessary causal connection can be established when a history of widespread abuse puts the responsible supervisor on notice of the need to correct the alleged deprivation, and he fails to do so." *Id.* at 1048 (quoting *Cottone*, 326 F.3d at 1360). "Alternatively, the causal connection may be established when a supervisor's custom or policy . . . result[s] in deliberate indifference to constitutional rights or when facts support an inference that the supervisor directed the subordinates to act unlawfully or knew that the subordinates would act unlawfully and failed to stop them from doing so." *Id.* (alterations in original) (quoting *Cottone*, 326 F.3d at 1360). Plaintiffs do not assert that Sheriff Jolley directed the deputies to act unlawfully or knew that they would do so but failed to stop them. So, for Sheriff Jolley to be held liable, "he must have failed to correct a widespread pattern of constitutional violations or he must [have] adopted a custom or policy that deprived [Nicholas] of his constitutional rights." *Id.*

Plaintiffs did not point to a widespread pattern of constitutional violations that Sheriff Jolley failed to correct. Rather, Plaintiffs' claim against Sheriff Jolley is based solely on his statement that he concluded, based on the dash cam video, that the deputies acted in accordance with his policy. Plaintiffs argue that a reasonable juror could conclude from this statement that Sheriff Jolley's policy was to allow his deputies to use gratuitous force on incapacitated arrestees, even though such a policy would directly conflict with Sheriff Jolley's written use of force policy, which only permits "that amount of force necessary to overcome the resistance that is being used against the [deputy]." Use of Force Policy § VII.

The Court is not convinced that a reasonable juror could find that Sheriff Jolley's statement was a repudiation of his written use of force policy such that the jury could conclude that he adopted a policy that deprived Nicholas of his constitutional rights. Rather, taken in context, Sheriff Jolley's statement suggests that he did not believe, as a factual matter, that Pierson used more force than was necessary under the circumstances. Because Plaintiffs did not present sufficient evidence to establish a genuine fact dispute on supervisory liability for Sheriff Jolley, Sheriff Jolley is entitled to summary judgment.

## II.  **State Law Claims**

Plaintiffs assert state law claims against Defendants for battery, negligence, and violations of the Georgia Constitution's provisions on searches and seizures and abuse during arrests.  Defendants contend that the evidence does not support such claims and that they are entitled to official immunity.

### A.  State Law Claims Against Pierson

All of Plaintiffs' claims against Pierson are based on the use of his knee to compress Nicholas's neck.  Pierson contends that Plaintiffs did not present enough evidence to support the battery and Georgia constitutional claims.  He also asserts that he is entitled to official immunity on all state law claims.

Under Georgia law, a "physical injury done to another shall give a right of action to the injured party."  O.C.G.A. § 51-1-13.  Pierson contends that he is entitled to summary judgment on the battery claim because Georgia law permits a law enforcement officer to use "such reasonable nondeadly force as may be necessary to apprehend and arrest a suspected felon or misdemeanant."  O.C.G.A. § 17-4-20(b); *accord* O.C.G.A. § 51-1-13 (recognizing a battery claim unless the person causing the injury "is justified under some rule of law").  As discussed above, though, there is enough evidence for a factfinder to conclude that Pierson used unreasonable force to apprehend and

arrest Nicholas, so this defense does not mandate summary judgment on Plaintiffs' battery claim.

In addition to their battery claim, Plaintiffs claim that Pierson violated the Georgia Constitution's provision on searches, seizures, and warrants. This provision is nearly identical to the Fourth Amendment. *Compare* Ga. Const. of 1983 Art. 1, § 1, ¶ XIII *with* U.S. Const. amend. IV. Plaintiffs also contend that Pierson violated the Georgia Constitution's provision that prohibits abuse during an arrest. *See* Ga. Const. Art. 1, § 1, ¶ XVII. Plaintiffs' claims under the Georgia Constitution are largely duplicative of their Fourth Amendment claims, and Pierson asserts the same defenses he asserted to those claims. As discussed above, the Court rejected those arguments, so they also do not support summary judgment on the Georgia constitutional claims.[6]

Pierson argues that even if Plaintiffs presented sufficient evidence to support their battery and Georgia constitutional claims, he is entitled to official immunity on these claims. Law enforcement officers are entitled to official immunity on

---

[6] In a footnote, Defendants point out that at least one panel of the Georgia Court of Appeals has cast doubt on whether a plaintiff may bring claims directly under the Georgia Constitution. *See Draper v. Reynolds*, 629 S.E.2d 476, 478 n.2 (Ga. Ct. App. 2006) (noting "that Georgia does not have an equivalent to 42 U.S.C. § 1983"). But another panel of the Georgia Court of Appeals declined to grant summary judgment on a plaintiff's claims under the Georgia Constitution. *Porter v. Massarelli*, 692 S.E.2d 722, 726–27 (Ga. Ct. App. 2010). The Court thus assumes for purposes of this motion that Plaintiffs may assert claims under the Georgia Constitution.

tort claims against them for their discretionary acts unless they acted "with actual malice or with actual intent to cause injury." *Kidd v. Coates*, 518 S.E.2d 124, 125 (Ga. 1999) (quoting Ga. Const. of 1983 Art. 1, § 2, ¶ IX(d)). "The phrase 'actual intent to cause injury' has been defined in a tort context to mean 'an actual intent to cause harm to the plaintiff, not merely an intent to do the act purportedly resulting in the claimed injury.'" *Id.* (quoting *Frame v. Boatmen's Bank*, 782 S.W.2d 117, 121 (Mo. App. 1989)). As discussed above, there is evidence to support a conclusion that Pierson intentionally pressed Nicholas's neck to the ground with his knee after he should have been able to see that Nicholas was handcuffed, incapacitated, and not resisting. From this, a jury could infer an actual intent to cause harm to Nicholas, so Pierson is not entitled to official immunity on Plaintiffs' battery and Georgia constitutional claims.

Plaintiffs' negligence claim cannot survive Pierson's official immunity challenge. If Plaintiffs are asserting that Pierson intentionally used excessive force without justification, then that claim is properly characterized as a battery claim. If Pierson's use of force was only negligent, then it follows that the use of force was not done with the requisite intent to overcome official immunity. Pierson is thus entitled to summary judgment on Plaintiffs' negligence claim.

B.   State Law Claims Against the Other Defendants

Plaintiffs also assert state law claims against Dawson, Harmon, and Sturdevant, arguing that they used excessive force against Nicholas without justification.  These claims appear to be based on these Defendants' failure to intervene when Pierson used his knee to compress Nicholas's neck.  Plaintiffs' battery claim against these Defendants fails because Plaintiffs did not point to any facts to suggest that Dawson, Harmon, or Sturdevant personally injured Nicholas.  And, all of Plaintiffs' state law claims against Dawson, Harmon, and Sturdevant are barred by official immunity because there is no evidence from which a reasonable juror could conclude that they acted with actual malice or actual intent to cause injury.  The Court thus grants Defendants' summary judgment motion as to these claims.

CONCLUSION

As discussed above, the Court denies Defendants' summary judgment motion (ECF No. 25) as to Plaintiffs' § 1983 claim against Pierson for violation of the Fourth Amendment.  The Court also denies Pierson's motion for summary judgment as to Plaintiffs' state law constitutional and battery claims.  Summary judgment is granted to Pierson on Plaintiffs' remaining state law claims.  Summary judgment is also granted as to all claims asserted against Defendants Jolley, Dawson, Harmon, and Sturdevant.  Accordingly, the only remaining claims are

Plaintiffs' claims against Pierson pursuant to § 1983, the Georgia Constitution, and Georgia law of battery.

Plaintiffs' motion to amend their complaint to comport with the evidence adduced during discovery (ECF No. 30) is granted. Plaintiffs shall electronically file an amended complaint within seven days of today's Order. If Defendant wishes to amend his expert's report based on any new allegations in the amended complaint related to the alleged cause of Nicholas's death, he must do so within twenty-one days of service of the amended complaint.

IT IS SO ORDERED, this 16th day of July, 2018.

S/Clay D. Land
CLAY D. LAND
CHIEF U.S. DISTRICT COURT JUDGE
MIDDLE DISTRICT OF GEORGIA